Darel TAYLOR and Margaret Taylor Darel Taylor, Appellee,

v.

The CONTINENTAL GROUP CHANGE IN CONTROL SEVERANCE PAY PLAN, The General Pension Board of the Continental Group, Inc., Robert Adams, "John Doe" Numbers 1–15 and "Mary Moe" Numbers 1–15 (Names Being Fictitious), Continental Group, Inc., Kiewit Continental, Inc., Jet Aviation of America, Inc., Robert Schaeberle, and "Peter Poe" Numbers 1–15 and "Linda Loe" Numbers 1–15 (Names Being Fictitious)

The Continental Group Change in Control Severance Pay Plan, Appellant.

No. 90–5556.

United States Court of Appeals, Third Circuit.

May 29, 1991.

Brian N. Lokker (argued), Hope M. Pomerantz, Williams, Caliri, Miller & Otley, Wayne, N.J., for appellant.

David Tykulsker (argued), Ball, Livingston & Tykulsker, Newark, N.J., for appellee Darel Taylor.

Before MANSMANN and SCIRICA, Circuit Judges, and POLLAK, District Judge *.

* The Honorable Louis H. Pollak, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

OPINION OF THE COURT

SCIRICA, Circuit Judge.

In this action under the Employee Retirement Income Security Act of 1974 (ERISA), The Continental Group Change in Control Severance Pay Plan challenges a grant of partial summary judgment awarding severance benefits to Darel Taylor. Because we find disputed issues of material fact, we will reverse and remand for further proceedings.

## I.

Taylor was employed by the Air Transport Division ("Air Transport") of The Continental Group, Inc. for more than 24 years, beginning in 1960. Air Transport was primarily responsible for scheduling and maintaining a fleet of private airplanes. On November 1, 1984, The Continental Group was taken over by Kiewit Continental, Inc.[1] In March, 1985, Continental sold the airplanes belonging to Air Transport. On May 29, 1985, Continental sold Air Transport's remaining assets to Jet Aviation of America, Inc. ("Jet"). At this time, Continental formally terminated all ten of Air Transport's employees, including Taylor. However, as part of its purchase agreement with Continental, Jet obligated itself to offer employment to these people. Taylor accepted employment with Jet. On October 27, 1986, Jet discharged Taylor for unsatisfactory work performance.

This action involves Taylor's claim for benefits under The Continental Group Change in Control Severance Pay Plan ("the Plan"). Continental created the Plan in 1982. In the summer of 1984, fearing a hostile takeover, Continental's Board of Directors adopted amendments to the Plan to provide further protection for all salaried non-unionized employees. The amendments were designed to protect certain employees who were terminated following a change in control of Continental. The stated purpose of the Plan as amended was "to encourage Employees to make and continue careers with The Continental Group,

Inc." Defendant's App. at 53. Taylor was covered by the Plan.

The Plan provides that covered employees shall receive severance payments upon "Involuntary Termination." *Id.* at 57. In § 2.10 of the Plan, Involuntary Termination is defined in relevant part as:

> any termination of an Employee's employment by the Company, or by one of its Subsidiaries, within two years after a Change in Control; provided, however, such term shall not include: .... (b) except in the event of an Unapproved Change in Control, a termination by the Company resulting solely from the disposition of any subsidiary or division, other than by dissolution or liquidation.

*Id.* at 55. The parties agree that the sale of Continental on November 1, 1984 constituted a Change in Control as the Plan defines the term, and that this was not an Unapproved Change. There is also no dispute that the sale of Air Transport to Jet did not constitute a Change in Control.

Taylor claims he is owed severance benefits because he was terminated by Jet within two years after a Change in Control. However, § 2.10 applies only to terminations by the "Company, or by one of its Subsidiaries." The term "Company" is defined as "The Continental Group, Inc. and all Subsidiaries." *Id.* at 54. "Continental Group" is further defined as "The Continental Group, Inc. and its successors or assigns." *Id.* The parties dispute whether Jet is considered a "successor" to Continental within the meaning of this term. If Jet is a successor, Taylor is entitled to benefits under this provision. If Jet is not a successor, Taylor is not entitled to benefits.

Before the 1984 change in control, Continental foresaw that employees might find themselves in Taylor's situation. On June 28, 1984, Continental issued a Special Policy that applied "only to an employee employed by a subsidiary or division of the Company which is sold or otherwise disposed of following a Change in Control,

---

1. Both The Continental Group, Inc. and Kiewit Continental, Inc. will be referred to as "Continental."

and who remains in the employ of the successor employer." *Id.* at 72. The Special Policy provides that:

> In the event that such employee is Involuntarily Terminated by the successor employer within two years from the Change in Control or within one year from the sale or other disposition of the subsidiary or division, whichever period ends first, the Company will cover such employee under [various benefits programs, including the Plan] which would have been provided had the employee remained in the employ of the Company or one of its subsidiaries. The terms "Change in Control" and "Involuntary Termination" have the same meanings as under such Policies.

*Id.* As can be seen, the Special Policy is similar to the Plan, but limits its coverage to terminations occurring within one year after the sale of a subsidiary or division. Taylor is ineligible for benefits under the terms of the Special Policy, because his termination occurred more than one year after the sale of Air Transport. However, the parties dispute whether the Special Policy was intended to supersede or merely supplement the Plan, and whether it would constitute a valid amendment to the Plan if it were intended as such.

As noted above, Jet purchased Air Transport's assets in May, 1985. The asset purchase agreement between Continental and Jet contained the following provision:

> In the event of the Involuntary Termination of employment of any salaried Employee, as defined in [the Plan], by [Jet] or any successor thereto within one year from the Closing ("Involuntary Termination"), [Jet] agrees to pay such Employee severance pay and benefits pursuant to the Severance Plan in effect as of the Closing which would have been applicable to such Employee on the date of such termination of employment.

*Id.* at 117–118. Jet thus obligated itself to pay benefits upon the termination of certain employees if Continental would have been required to do so. Mirroring the terms of the Special Policy, the asset purchase agreement required Jet to compensate only those employees discharged within one year after the purchase of Air Transport. This appeal does not concern Jet's obligations.

Following the sale of Air Transport, Jet employees who had previously worked for Air Transport raised questions about their eligibility under various benefits programs. *See* Certification of Robert E. Adams, Defendant's App. at 77–78. Continental circulated a response which included a discussion of whether former Continental employees who now worked for Jet were entitled to severance benefits. This response stated that:

> The Severance Plan does not apply to employees whose employment is "terminated" solely by reason of the sale of a business of the Company. That type of termination is not considered an "Involuntary Termination" for the purposes of receiving benefits under the Plan.
>
> However, the Company has extended severance benefits under the Severance Plan to employees who are involved in the sale of a business, where such employees are subsequently Involuntarily Terminated, other than for cause, by the new owners of that business within the earlier of October 31, 1986, or a date within one year after the sale of the business unit involved. Therefore, in the case of the Air Transport employees, any employee who is Involuntarily Terminated, other than for cause, by Jet Aviation prior to May 29, 1986, will be eligible for the benefits available under the Continental Change in Control policies as if Continental had laid that person off at that time.

*Id.* at 90.

Taylor pursued his claim for severance benefits with an internal pension board. In initial correspondence with the board, Taylor argued in part that he was owed benefits because he was terminated within two years after a Change in Control. Plaintiff's App. at 2. However, the only argument pressed in subsequent correspondence was that his job duties had been "materially reduced," and as a consequence he was owed benefits under a different

provision of the Plan. *See id.* at 15–18; Defendant's App. at 56 (material reduction in job duties considered an Involuntary Termination under the Plan). The board rejected Taylor's "material reduction" claim, and did not address any claim regarding the two year termination provision. The "material reduction" claim is not before us on appeal. We note, however, that it appears that any "material reduction" claims are also subject to the two year limitation.

 Taylor and his wife then sued the Plan in district court. The district court granted partial summary judgment to Taylor, holding that he was entitled to benefits under the Plan because he was terminated by a "successor" to Continental within two years after a Change in Control. In addition, the court held that the Special Policy could not alter any of Taylor's rights under the Plan because it did not constitute a legally valid amendment to the Plan. The Plan now appeals from this judgment.[2]

## II.

The Plan is governed by ERISA and this action was brought pursuant to 29 U.S.C. § 1132(a)(1)(B) (1988), which permits suits by beneficiaries to recover benefits. This dispute centers around the proper interpretation of various provisions of the Plan. In

particular, the parties differ over whether Jet's purchase of Air Transport makes it a "successor" to Continental under the Plan. The parties have assumed that this dispute can be resolved through summary judgment. However, we find that critical provisions of the Plan are ambiguous, and that their meaning is a disputed issue of material fact. Consequently, we will reverse the district court's grant of summary judgment and remand for further proceedings consistent with this opinion.

## A.

The district court granted summary judgment to Taylor. Consequently, we must consider the evidence in the light most favorable to the nonmoving party, and can affirm only if no genuine issue of material fact remains in dispute and "the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). We apply the same standard of review as that employed by the district court. *Erie Telecommunications, Inc. v. Erie*, 853 F.2d 1084, 1093 (3d Cir.1988).

 In this case, the district court was required to exercise de novo review. As the Supreme Court held in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109

---

**2.** Taylor contends that we lack jurisdiction because defendant's Notice of Appeal was not timely filed. *See* Fed.R.App.P. 4(a)(1) (notice of appeal must be filed within 30 days after the date of the judgment or order appealed from). We disagree. On May 9, 1990, the district court entered an order that had been proposed by the parties. This order contained one paragraph certifying the order as a final judgment under Fed.R.Civ.P. 54(b), and one paragraph certifying the order for interlocutory appeal under 28 U.S.C. § 1292(b). The inconsistent certifications made it difficult for defendant's counsel to determine how the order should be appealed. When an order has been certified as a final judgment under Rule 54(b), a notice of appeal must be filed within 30 days. *See* Fed.R.App.P. 4(a). But when an order has been certified under § 1292(b), a party must file a petition for permission to appeal within 10 days. *See* Fed. R.App.P. 5(a). In addition, a court of appeals has discretion over whether to accept a § 1292(b) appeal. On May 29, in response to a request by defendant's counsel, the district court vacated its earlier order and signed a new order containing only the Rule 54(b) certification.

This order was filed on May 30 and entered on June 6. On June 21, defendant filed its notice of appeal, which designated this new order. Taylor claims the notice was untimely, because it was filed more than 30 days after entry of the initial May 9 order. However, we believe defendant has properly appealed from the June 6 order. This is not a case where the district court has attempted to "relax the time periods specified in Fed.R.App.P. 4 merely by vacating and refiling judgments." *McGarr v. United States*, 736 F.2d 912, 918 (3d Cir.1984). The May 9 order was inadequate to inform defendant of the proper avenue of appeal, and this confusion was rectified by the later order. When a judge vacates an earlier order and replaces it with a materially different version, a party may appeal the later order regardless of whether it has filed a motion to amend the judgment or a motion to extend the time for appeal. *Cf. Burkett v. Cunningham*, 826 F.2d 1208, 1216–17 (3d Cir.1987) (permitting appeal of order vacating and reissuing earlier order where post-judgment motion not made solely for the purpose of extending time for appeal).

S.Ct. 948, 103 L.Ed.2d 80 (1989), "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115, 109 S.Ct. at 956. As the district court noted, the Plan does not give its administrators such discretionary authority, and the de novo standard is appropriate here. Prior to *Bruch,* many courts had reviewed denials of benefits under an "arbitrary and capricious" standard that afforded deference to an administrator's interpretation of plan provisions. In *Bruch,* the Court held that when an administrator has denied benefits, a deferential standard of review would be contrary to the principles of trust law underlying ERISA. As in this case, *Bruch* involved severance claims by employees who had been terminated when their division was sold, and who were immediately rehired by the purchasing company.

Subsequent to *Bruch,* we held that the interpretation of ambiguous plan provisions is a question of fact. In *Anderson v. Pittsburgh–Des Moines Corp.,* 893 F.2d 638 (3d Cir.1990), an employee had worked for one company which was then acquired by another company. The employee claimed that he was owed pension benefits based on the time spent with both companies, but the plan administrator did not credit the time spent with the former employer. As in this case, the dispute in *Anderson* centered around the proper interpretation of the term "Company." In *Anderson,* the parties disputed whether the term "Company" included a predecessor of the current employer. As in *Bruch,* we applied general common law principles and noted that "[w]hile 'a clear and unambiguous contractual provision raises no factual issue,' ... 'as a general rule the meaning of a contract is a matter of fact.'" *Id.* at 640 (quoting *First Jersey Nat'l Bank v. Dome Petroleum Ltd.,* 723 F.2d 335, 339 (3d Cir. 1983)). We found that the district court erred in determining that the term "Company" was unambiguous, and we remanded for a new trial.

■ The determination of whether a term is ambiguous is a question of law. *Mellon Bank, N.A. v. Aetna Business Credit, Inc.,* 619 F.2d 1001, 1011 (3d Cir. 1980). A term is ambiguous if it is subject to reasonable alternative interpretations. *Id.* We recognize that in *Ulmer v. Harsco Corp.,* 884 F.2d 98, 101–02 (3d Cir.1989), we noted that the proper interpretation of the severance plan at issue was a question of law. As in this case and *Bruch, Ulmer* involved severance claims by employees who had been terminated when their division was sold, and who were immediately rehired by the purchasing entity. However, in that case we determined that the language of the plan was not ambiguous. *Id.* at 103. Consequently, we were able to interpret the plan as a matter of law.

When an ERISA plan is ambiguous, ascertaining its meaning requires examining many factors, which may include considering how the plan was understood by its beneficiaries. In *Bruch,* the Supreme Court quoted language from the Restatement (Second) of Trusts indicating that only the "intention of the settlor" is relevant. *See Bruch,* 489 U.S. at 112, 109 S.Ct. at 955 (quoting Restatement (Second) of Trusts § 4, comment d (1959)). But trust law cannot be imported wholesale into the ERISA context. Severance plans are often similar to employment contracts, whose interpretation requires determining the intent of both contracting parties. *Bruch,* 828 F.2d 134, 145 (3d Cir.1987), *rev'd on other grounds,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989).

■ In this case, the Plan was adopted to encourage employees to stay with Continental despite an impending takeover. It does not appear that the Plan was the product of explicit bargaining between Continental and its employees. As we have noted, such severance plans are in essence unilateral contracts, which often makes it difficult to discern the true "intention" of the parties. *Id.* at 147. In this situation, the reasonable understanding of the beneficiaries, as well as the intent of the employer, may be admissible to clarify

ambiguities. On remand, the district court may consider interpretive statements made by Continental, past practices, customary usage in the trade, and other competent evidence bearing on the understanding of the parties. *Id.* at 147–48.

■ Taylor urges that we adopt a rule that construes ambiguous terms of a benefit plan against the drafter of the plan. He notes that the dissent in *Flick v. Borg–Warner Corp.*, 892 F.2d 285 (3d Cir.1989), indicated that in ERISA cases "clearly expressed intentions govern (even if pro-employer), but silence or ambiguity is construed in favor of the employee participants." *Id.* at 291. The majority did not reach the issue. However, in that case the dissent was addressing the employer's ability to amend a plan, and did not discuss precisely when its proposed rule should be applied. When discussing denials of benefits, the Supreme Court clearly stated in *Bruch* that:

> [a]s they do with contractual provisions, courts construe terms in trust agreements *without deferring to either party's interpretation....* The terms of trusts created by written instruments are "determined by the provisions of the instrument as interpreted in light of all the circumstances and such other evidence of the intention of the settlor with respect to the trust as is not inadmissible."

489 U.S. at 112, 109 S.Ct. at 955 (quoting Restatement (Second) of Trusts § 4, comment d (1959)) (emphasis added). *See also Bruch*, 828 F.2d at 145 (severance plan is similar to contract for wages, and thus should be construed as would other arms'-length transactions), *rev'd on other grounds*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Consequently, when interpreting an ERISA severance plan, a district court should attempt to determine its intended meaning without construing it in favor of any party. Only if this factual inquiry proves fruitless should a court resort to constructions in favor of one party or another.

The Court of Appeals for the Ninth Circuit has held that ambiguities in insurance contracts governed by ERISA are to be construed against the insurer. *Kunin v. Benefit Trust Life Ins. Co.*, 910 F.2d 534 (9th Cir.1990) (alternative holding), *cert. denied*, — U.S. ——, 111 S.Ct. 581, 112 L.Ed.2d 587 (1990). Under this rule, when an ambiguity is discovered, "the interpretation that is most favorable to the insured will be adopted." *Id.* at 539 (quoting A. Windt, *Insurance Claims and Disputes* § 6.02, at 281 (2d ed.1988)). The *Kunin* court held that *Bruch* did not preclude it from applying a "presumption" in favor of one party without necessarily "deferring" to that party's interpretation. *Id.* at 541. The Court of Appeals for the Eighth Circuit has explicitly rejected the approach in *Kunin*, holding that *Bruch* has pre-empted the traditional rule that ambiguous insurance contracts are construed against the insurer. *Brewer v. Lincoln Nat'l Life Ins. Co.*, 921 F.2d 150 (8th Cir.1990).

These cases, however, involved insurance contracts, where the principle of *"contra proferentem"* is often strictly applied. We express no opinion on whether *Bruch* has diluted the traditional rule in that area. In the context of general contract law, the principle is employed as a constructional tool, but does not affect the factual inquiry into the intent of the parties. *John F. Harkins Co. v. Waldinger Corp.*, 796 F.2d 657, 662 n. 2 (3d Cir.1986), *cert. denied*, 479 U.S. 1059, 107 S.Ct. 939, 93 L.Ed.2d 989 (1987). As one court has noted, "[r]ules of construction such as the principle that in certain circumstances a contract may be construed adversely to the party that drafted it are principles of last resort, to be invoked when efforts to fathom the parties' intent have proved fruitless." *Record Club of America, Inc. v. United Artists Records, Inc.*, 890 F.2d 1264, 1271 (2d Cir. 1989) (citations omitted). *See also Lippo v. Mobil Oil Corp.*, 776 F.2d 706, 714 n. 15 (7th Cir.1985); *Board of Trade v. Swiss Credit Bank*, 597 F.2d 146, 149 (9th Cir. 1979); *Quad Constr., Inc. v. Wm. A. Smith Contracting Co.*, 534 F.2d 1391, 1394 (10th Cir.1976). As we have noted, non-bargained severance plans raise special interpretational concerns. But we do not adopt a rule that would construe ambiguities against the drafter without first at-

tempting to ascertain the intent of the parties.

### B.

█ As in *Anderson,* we believe that the Plan and the Special Policy are sufficiently ambiguous to create triable issues of fact. Here, the term "successor" is ambiguous. The district court found that Jet was a "successor" to Continental in part because the Plan provided that it should be construed in accordance with New York law, and "New York law routinely refers to asset purchasers as 'successors.'" Memorandum Opinion at 7. However, while reported cases may be instructive as to how the term "successor" is interpreted in other contexts, the task here remains to discern the understanding of the parties. As the Supreme Court has stated in the context of successor liability under the Labor Management Relations Act, "[t]here is, and can be, no single definition of 'successor' which is applicable in every legal context. A new employer, in other words, may be a successor for some purposes and not for others." *Howard Johnson Co. v. Detroit Local Joint Executive Bd.,* 417 U.S. 249, 263 n. 9, 94 S.Ct. 2236, 2243 n. 9, 41 L.Ed.2d 46 (1974). For example, the New York cases cited by Taylor concern whether a company can be considered a successor for purposes of imposing tort liability. *See Hartford Accident & Indem. Co. v. Canron, Inc.,* 43 N.Y.2d 823, 402 N.Y.S.2d 565, 373 N.E.2d 364 (1977); *Greenlee v. Sherman,* 142 A.D.2d 472, 536 N.Y.S.2d 877 (App.Div.1989). This case does not involve defining the term "successor" for purposes of imposing statutory or tort liability. Rather, the term "successor" must be given the meaning intended by the drafters of the Plan and reasonably understood by its beneficiaries.

The district court apparently believed that the meaning of the term "successor" was plain enough to support a judgment for Taylor as a matter of law. In determining that Jet was a successor to Continental, the district court stated that "[d]efendants' argument is undermined ... by the provision in the sale agreement which requires Jet to pay benefits under the Special Policy when the Special Policy, like the Plan, extends only to a 'successor employer.'" Memorandum Opinion at 7. In addition, the court held that denying Taylor's claim would "conflict[ ] with defendants' declared goal of providing employees with job security in the event of a takeover." *Id.*

█ But the district court's reliance on the terms of the sale agreement and the Special Policy follows only if the term "successor" is ambiguous, which would permit the introduction of such extrinsic evidence. Under the principles of trust law endorsed in *Bruch,* "[t]he intention of the settlor at the time of creation of the trust may ... be shown by facts occurring after that time to the extent that evidence of such facts is admissible to show such intention under the rules of evidence." Restatement (Second) of Trusts § 4, comment a (1959). However, the parol evidence rule generally bars the use of extrinsic evidence to interpret a document unless that evidence is offered to clarify an ambiguity. *See Anderson,* 893 F.2d at 640–41; *Thermice Corp. v. Vistron Corp.,* 832 F.2d 248, 252–53 (3d Cir.1987). Thus, the district court's discussion would be relevant only if an ambiguity exists. We note, though, that the district court was mistaken when it indicated that both the Plan and the Special Policy refer to a "successor employer." Although the Special Policy applies to a "successor employer," the Plan refers only to a "successor." This distinction may be important, given defendant's argument that the Plan was not intended to apply to all successor employers.

We believe defendant has sufficiently demonstrated that the term "successor" is ambiguous. Defendant notes that under § 2.10(b) of the Plan, employees whose discharges result "solely from the disposition of any subsidiary or division other than by dissolution or liquidation" are excluded from benefits. Taylor was discharged from Continental when Air Transport was sold to Jet. *Cf. Ulmer v. Harsco Corp.,* 884 F.2d 98 (3d Cir.1989) (employees fired when division was sold were terminated

within meaning of severance plan, even though they had been rehired by purchasing entity). Defendant claims that Taylor was therefore excluded from benefits under § 2.10(b), and that interpreting the term "successor" to include a purchaser of a division would render that provision ineffectual. An employee whose termination is excluded under § 2.10(b) would find himself covered again once he accepted re-employment with the purchasing entity. We believe this interpretation is sufficient to demonstrate that the term "successor" is ambiguous. *See Sejman v. Warner–Lambert Co.*, 889 F.2d 1346, 1348–50 (4th Cir. 1989) (termination by purchaser of division not termination "by the Company" within the meaning of severance plan), *cert. denied*, —— U.S. ——, 111 S.Ct. 43, 112 L.Ed.2d 19 (1990).

The intended effect of the Special Policy poses a related ambiguity. According to defendant, the Special Policy was intended to extend benefits to employees whose terminations were not otherwise covered by the Plan. In defendant's view, the Special Policy was adopted precisely to afford some protection to those employees who were discharged as the result of the sale of a division and subsequently re-employed by the purchaser. The Special Policy, however, limits its coverage to terminations occurring within one year of the sale, which excludes Taylor's termination by Jet. Under defendant's interpretation, therefore, the term "successor employer" in the Special Policy was specifically intended to carry a different meaning from the term "successor" used in the Plan.

Defendant supports this interpretation with the statement circulated by Continental in response to employee questions following the sale of Air Transport. In this statement, Continental indicated that the termination of Air Transport employees fell within the coverage exclusion of § 2.10(b), but that those employees who accepted employment with Jet would be covered under the Special Policy for one year after the sale. Defendant also points to a certification submitted by a Continental lawyer who was involved in drafting the Plan. As with all competent evidence occurring after the adoption of the Plan and the Special Policy, these statements may be admissible to resolve ambiguities. We leave it to the district court to determine how much weight they should be given.

Taylor asserts that his termination by Jet is covered under the Plan itself, and that the Special Policy was intended to restrict, rather than expand, the rights of employees in his situation. Taylor admits that he is ineligible for benefits under the terms of the Special Policy, but claims that the Special Policy is ineffective because it was not validly adopted. As we have noted, the circumstances surrounding the promulgation of the Special Policy can be used to clarify ambiguities on remand. The validity of the Special Policy is relevant only if it is determined that Taylor is entitled to benefits under the terms of the Plan. Consequently, we decline at this time to reach the question of whether the Special Policy would constitute a valid amendment to the Plan if it were intended as such.

### III.

Taylor also contends that the Plan may not even raise the argument that Jet is not a successor to Continental, because that argument was not raised by the internal pension board. Taylor cites 29 U.S.C. § 1133(1) (1988), which provides that when a claim has been denied internally, the trustee must provide written notice "setting forth the specific reasons for such denial." Taylor relies on cases indicating that ERISA's goal of efficient claims resolution would be compromised if a rationale for the denial of benefits were raised for the first time in the district court. *See Short v. Central States, S.E. and S.W. Areas Pension Fund*, 729 F.2d 567, 575 (8th Cir.1984); *Richardson v. Central States, S.E. and S.W. Areas Pension Fund*, 645 F.2d 660, 664–65 (8th Cir.1981).

We believe defendant adequately complied with § 1133. We have held that an ERISA claimant may rely on a different theory in the district court from that pursued administratively. *Wolf v. National Shopmen Pension Fund*, 728 F.2d 182, 186

**1236**

(3d Cir.1984). Taylor's attorney pressed the claim based on Taylor's termination—as distinguished from the "material reduction" claim—only in initial correspondence with the pension board. Plaintiff's App. at 2. Thereafter, the record indicates that the claim based on termination was not raised again until the district court level. Taylor himself indicated that only the "material reduction" claim was before the board. In a certification submitted to the pension board, Taylor stated that the company had

> attempted to confuse the issue before the General Pension Board by injecting my termination into this proceeding. The issue is not relevant to whether Jet caused me to suffer a material reduction in my responsibilities and authorities, *the standard under which my claim for severance benefits is to be judged.*

Plaintiff's App. at 32 (emphasis added). In this situation, the board sufficiently complied with the requirement that it provide written notice of the reasons for its denial. Its response was directed toward what appeared to be the sole thrust of Taylor's arguments before it. *Cf. Voliva v. Seafarers Pension Plan,* 858 F.2d 195, 196–97 (4th Cir.1988) (defendant may rely on new argument to counter evidence first introduced by plaintiff in district court).

### IV.

Because we find that the Plan and the Special Policy are susceptible to reasonable alternative interpretations, we will reverse the district court's grant of summary judgment and remand for further proceedings. On remand, the parties may introduce any admissible evidence bearing upon the intended meaning of the disputed terms.