Edwin L. MARSH, Howard W. Bigleman, Anthony J. DeCosta, John R. Kundick, Theodore T. Lehmann, Robert A. Lippert, Frank S. Matsukas, Lawrence V. Nagle, William H. Stephens, Plaintiffs,

v.

CRUCIBLE INC. 1975 SALARIED RETIREMENT PLAN, Defendant.

Civ. A. No. 90–727.

United States District Court, W.D. Pennsylvania.

Jan. 17, 1992.

---

**15.** See: Record Document No. 8, filed February 7, 1990.

James J. Ahearn, Ligonier, Pa., for plaintiffs.

·Paula Ganz, William H. Powderly, III, Jones Day Reavis & Pogue, Pittsburgh, Pa., for defendant.

## MEMORANDUM OPINION

MENCER, District Judge.

Plaintiffs brought this action seeking to compel the payment of certain claimed retirement benefits from the defendant Plan. The parties have filed cross-motions for summary judgment under Rule 56 of the Federal Rules of Civil Procedure, each side arguing that there are no material disputes of fact and claiming entitlement to summary judgment as a matter of law. The central question presented is whether, under the terms of the Plan itself, the plaintiffs are entitled to receive further benefits once they reach the age of 62, even though they were forcibly retired prior to reaching this age when the Crucible plant located in Midland, Pennsylvania shut down its operations in July, 1982. We have jurisdiction under 29 U.S.C. § 1132(f) and 28 U.S.C. § 1331.

## I. FACTS AND PROCEDURAL HISTORY

All the plaintiffs in the instant action were also plaintiffs in an earlier case in which the Plan was a named defendant, *Ashenbaugh, et al. v. Crucible Inc. 1975 Salaried Retirement Plan*, docketed in this court at No. 86–1571 and reported at 1987 WL 108960 and reviewed by the Third Circuit in an opinion reported at 854 F.2d 1516 (3d Cir.1988). In that case, a much larger group of Crucible employees, including all the plaintiffs in this case, were represented. Unlike the plaintiffs in this case, however, many of the *Ashenbaugh* plaintiffs had not worked at the Midland plant for thirty years at the time that the plant was closed. Accordingly, the principal thrust of the *Ashenbaugh* case was whether employees who had not served a full thirty years before they were terminated should be granted a pro rata share of an early retirement benefit provided for by the Plan for employees who had completed thirty years of service. The Third Circuit Court of Appeals held that the employees did not have any such right. However, in footnote number 7 of the opinion, the court stated:

Apparently not yet in dispute at the time this action was filed is the related question of whether employees with 30 years of service who were not yet 62 at the time of their termination and request for benefits and whose benefits were therefore subject to the § 4.3(b) cap would, *when they subsequently attained age 62,* become entitled to receive benefits calculated under § 4.3(a), without reference to the cap. The plaintiffs do raise this issue in their brief, albeit in somewhat hypothetical terms.... However, it is not asserted that the Plan has made a determination of this issue—nor that the Plan has been asked to do so by any participant. In addition, this issue, quite properly, was not addressed by the district court. In light of these circumstances, we cannot address this question at this point [citations omitted]. 854 F.2d at 1521, n. 7.

Soon after *Ashenbaugh* was decided, the plaintiffs in this case, all of whom met the description in footnote 7 of "employees with 30 years of service who were not yet 62 at the time of their termination," attempted to file a claim with the Plan of the type outlined in footnote 7. There is some factual dispute regarding how the plaintiffs filed the claim, whether they complied with the procedures required by the terms of the Plan, and how the Plan responded to the written submissions of plaintiffs.

Plaintiffs claim that they have attempted to follow the proper claims procedure but were rebuffed by the Claims Administrator and the Retirement Committee. Plaintiffs have attached a copy of three separate mailings which were sent in early December of 1988. Two of the mailings were addressed to the "Retirement Committee" and the third was addressed to the "Plan Administrator." All three were returned marked "refused" by the Crucible Headquarters. Plaintiffs contend that the refusal of the Crucible Administrators to answer correspondence indicates that the Plan has waived its right to insist that plaintiffs exhaust the procedures for filing claims.

The Plan responds by making available copies of several letters written by the Plan Administrator in which she takes the position that plaintiff's counsel, Mr. Ahearn, did not follow the proper procedures for filing a claim. The Plan has also filed an affidavit executed by the Plan Administrator in which she describes a chronology of letters which run from September of 1988, several months before the one mailing was refused, until May of 1989, several months after the refusal. This affidavit, accompanied by copies of certain of the letters described therein, makes clear that the Plan Administrator was concerned that: 1) Mr. Ahearn did not submit any documentation properly identifying him as the representative of the plaintiffs; 2) Mr. Ahearn failed to provide documentation regarding the identities of and benefits requested by the plaintiffs; 3) the Plan could not pay attorney fees to Mr. Ahearn for his representation of the plaintiffs; 4) that the asserted basis for the plaintiffs' claim was not ascertainable from Mr. Ahearn's reference to the two footnotes in the *Ashenbaugh* opinion. The affidavit does not explain, however, why Mr. Ahearn's early December 1988 letter to the Plan Administrator was returned unanswered.

In addition, the Plan Administrator's affidavit does analyze what she perceives to be the claim of the plaintiffs and concludes that she would deny the claim. A second affidavit, filed by a member of the Plan Retirement Committee, the body which reviews the decisions of the Plan Administrator, concludes that the hypothetical decision of the Plan Administrator would be upheld, were that claim presented to the Retirement Committee.

## II. ANALYSIS

The parties raise two issues in their respective motions for summary judgment: one, whether the plaintiffs have exhausted the administrative procedures for filing a claim; and two, whether the plaintiffs have a right to a recalculation of benefits once the terminated employees reach the age of 62.

### A. Administrative Exhaustion.

■ An employee claiming a benefit under an ERISA retirement plan ordinarily must exhaust the procedures established by the Plan for making a claim for benefits before the employee is entitled to court review. *Wolf v. National Shopmen Pen. Fund,* 728 F.2d 182, 185 (3d Cir.1984); *Zipf v. American Tel. & Tel. Co.,* 799 F.2d 889, 892 (3d Cir.1986). In *Zipf,* the Third Circuit noted that:

> When a plan participant claims that he or she has unjustly been denied benefits, it is appropriate to require participants first to address their complaints to the fiduciaries to whom Congress, in Section 503, assigned the primary responsibility for evaluating claims for benefits. This ensures that the appeals procedures mandated by Congress will be employed, permits officials of benefit plans to meet the responsibilities properly entrusted to them, encourages the consistent treatment of claims for benefits, minimizes the costs of delays of claims settlements in a nonadversarial setting, and creates a record of the plan's rationales for denial of the claim.

*Id.* at 892. There is thus no question that the requirement of administrative exhaustion should be enforced as a matter of policy generally.

■ The Plan argues in particular that two requirements were not followed. First, Mr. Ahearn, as attorney for the plaintiffs, never submitted a proper form which demonstrates that he has authorization from the plaintiffs to represent them in this particular claim. The Plan contends that the contingency fee arrangement forms which provide that Mr. Ahearn is to represent plaintiffs in all claims they have before the Plan are inadequate for this purpose. Second, the Plan argues that it was never given proper notice of the nature of the claim to make a decision. The Plan also appears to argue that even if adequate notice of the nature of the claim was given, the claim was not stated with the clarity and precision required by the claims procedure. Finally, the Plan contends that the plaintiffs never filed a Plan-

supplied form as required by the claim procedure in the Plan, but rather wrote letters.

Plaintiffs do not contest any of these assertions. Rather, they argue that the fact that three of the submissions were returned, combined with the fact that the Plan continually insisted on proof that Mr. Ahearn had authority to represent the plaintiffs, demonstrates that to have pursued the claim through the procedures would have been futile and that the Plan has waived any objections to a judicial determination.

■ We think that the Plan has established that the plaintiffs failed to comply with the claims procedures as set out in the Plan. We also think that the evidence set forth by the plaintiffs is inadequate to establish that following the procedures would have been futile.[1] But we do not think that it would be wrong for this court to decide the substantive issues raised by the parties. Because the Plan has submitted affidavits in which both the Plan Administrator and the Retirement Committee have considered and rejected a hypothetical claim that is identical to that being urged by the plaintiffs, much of the rationale for the requirement of exhaustion as set forth in the *Zipf* case is not present here. Furthermore, the Plan may be said to have waived its right to insist that the claims procedures be exhausted inasmuch as both the Plan Administrator and the Retirement Committee have made a final (albeit hypothetical) determination of the claim, and inasmuch as the Plan has filed Complaints for Summary Judgment in which it has asked this court to declare that the plaintiffs "have received and are receiving, all benefits to which they are entitled under § 4.3 of the 1975 Salaried Plan ..."[2]

**B.** *Inquiry regarding whether there is any provision for a recalculation of benefits under the plain language of the Plan.*

■ Plaintiffs' first claim is that the plain language of the Plan provides for a recalculation of benefits once a participant in the Plan attains the age of 62. The Plan provides, in relevant part:

**4.3 Thirty Year Retirement.** ... [T]he annual retirement benefit payable to a Participant who shall retire on a Thirty Year Retirement Date, from said Date for the remainder of his life, shall be whichever one of the following is applicable:

(a) If the Participant has attained age sixty-two (62), an annual retirement benefit computed in accordance with subdivisions (i) and (ii) of subsection (a) of Section 4.1, or

(b) If the Participant has not attained age sixty-two (62), an annual retirement benefit which shall be the greatest of:

(i) the annual retirement benefit computed in accordance with subdivisions (i) and (ii) of subsection (a) of Section 4.1, limited to $250 a year multiplied by the total number of years (including monthly fractions of a year) of Credited Service,

.  .  .  .  .

(iii) the immediate annual retirement benefit or deferred retirement benefit computed in accordance with Section 4.4 if, at the time of Retirement under this subsection (b), the participant had attained age fifty-five (55).

The plaintiffs claim that the Plan plainly provides that there shall be a different benefit "if the Participant has attained age sixty-two." The defendant Plan points out that both subsections (a) and (b) are qualified by the paragraph under the heading of

---

**1.** As noted above, three separate mailings that were sent to Colt's New York City headquarters in early December 1988 were refused. The Plan has offered evidence, however, that there were several more exchanges of letters following the refusal of the December mailings. Although the Plan does not offer any explanation for the refusal, we do not think that this single incident is sufficient to establish the futility of the established procedures, particularly since the subsequent correspondence demonstrates that the Plan responded to Mr. Ahearn's mailings.

**2.** We recognize, of course, that these complaints are not filed as a part of this case, but as separate lawsuits.

section 4.3, which provides that "the annual retirement benefit payable who shall retire on a Thirty Year Retirement Date, *from said date for the remainder of his life,* shall be whichever one of the following is applicable ..." (emphasis added). In the view of the defendant, this language forecloses any possibility of a recalculation once a retired participant reaches age 62 because it fixes the benefit under either subsection (a) or (b) "from said date for the remainder of [the Participant's] life."

The court agrees that the plain language of the Plan fixes the benefit once the Participant retires on the Thirty Year service date. No reasonable person would read in a provision for a recalculation of benefits once an already-retired participant attains age 62 given the qualifying provision that the benefit provided for is fixed "for the remainder of [the Participant's] life." Because there is no ambiguity present in the plan instruments, the court's inquiry should go no further. Allegations that the result is contrary to the purpose of the Plan are unavailing. *See Ashenbaugh,* 854 F.2d at 1530, n. 17.

Perhaps sensing how flimsy the argument for a recalculation under the plain language is, the plaintiffs have devoted much more space in their briefs in an effort to convince the court that even if a recalculation is not clearly provided for under the plain language, the language at least admits of an ambiguity.

As support for the existence of an ambiguity, plaintiffs refer to footnote 7 in the *Ashenbaugh* decision in which the Third Circuit court acknowledged the existence of the issue of whether a recalculation should occur. 854 F.2d at 1521, n. 7. Plaintiffs suggest that the footnote serves as an affirmation of the presence of ambiguous language. However, the court is satisfied that the only function of footnote 7 was to indicate that the Third Circuit had taken no action whatsoever with regard to this issue.

C. *Analysis of plaintiff's claim for benefits in the hypothetical case of ambiguous language in the Plan.*

Although the court is persuaded that the clear language of the Plan indicates no provision for a recalculation, the plaintiffs would not be entitled to a recalculation even if there were an ambiguity as the plaintiffs claim. The Plan contends that because the Plan instrument grants to the Plan Administrator and the Retirement Committee the authority to resolve ambiguities, this court should uphold the decision to deny a recalculation of benefits to the plaintiffs.

The case which established that a plan instrument may place discretionary authority in a plan administrator or other official to resolve questions of eligibility is *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). The Court stated:

Consistent with established principles of trust law, we hold that a denial of benefits ... is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.

109 S.Ct. at 956.

In this case, the relevant Plan provision provides, in relevant part:

10.11 The Plan Administrator shall be responsible for the determination of the benefits due a Participant or Beneficiary under the Plan ... Any Participant or Beneficiary whose claim is denied by the Plan Administrator shall have the right to request a review of the determination of the Plan Administrator by the [Retirement] Committee ...

The *Bruch* Court did not provide any further guidance regarding what type of language is necessary to endow a plan administrator with discretionary authority. In addition, the Third Circuit court has not yet established any guidelines. This court, however, dealt with the issue in *Martin v. Masco Industries Employees' Benefit Plan,* 747 F.Supp. 1150 (W.D.Pa.1990). In *Martin,* this court ruled that "... in order to warrant the deferential review of an arbitrary and capricious standard, a plan

must, on its face, manifest a clear and unequivocal intention to commit a matter to an administrator's discretion." *Id.* at 1152. This standard is largely in keeping with Restatement (2d) of Trusts § 186 ("... the trustee can properly exercise such powers and only such powers as are conferred upon him in specific words by the terms of the trust ...").[3]

Applying this standard, it does not appear that the Plan documents "manifest a clear and unequivocal intention" to commit the matter of the determination of benefits to the discretion of the Plan Administrator or the Retirement Committee. *See Martin,* 747 F.Supp. at 1152–53 (plan document that establishes a system of evaluating claims that includes an initial determination and an appeals procedure to a Benefits Committee does not sufficiently evince intention to confer discretionary authority, even though document grants Benefits Committee the "authority to make the final decision on [a] claim if it has been appealed.")

Accordingly, were an ambiguity present in the disputed provision, this court would conduct a *de novo* review. The inquiry would focus on what the intent of the settlor was when the trust was established. *Bruch,* 109 S.Ct. at 955. We would, however, uphold the decision of the Retirement Committee. The basis for this conclusion is provided by the affidavit of the Plan Administrator. Although we are not required to defer to the decision of the Plan Administrator, we find that her reasons for denying the claim are persuasive. First, section 10.3 does not expressly provide for a recalculation. Second, the court is convinced that the existence of an implied recalculation simply would not make any

sense in light of other express provisions of the Plan. One example of how the structuring of the benefits belies a recalculation is that there are serious questions regarding how the recalculation would affect the participants' Qualified Joint and Survivor Annuities. Had the plan sponsor intended a recalculation, one would expect that there would have been some express provision for how the recalculation would treat prior payments under the Qualified Joint and Survivor Annuity.[4] Another example of the incongruity of an implied recalculation provision is that at least some participants would receive lower benefits after a recalculation because the recalculation would occur when a five percent additional benefit which is currently effective will have expired. Pastor Affidavit at 37.

■ Plaintiffs' principal argument in opposition is that there is some evidence indicating that the intent of the plan sponsor in providing greater benefits to those 30 year service personnel aged 62 or greater than to similarly situated younger personnel was to provide an incentive for experienced personnel to continue to work for the company until age 62 rather than to go to work for a competitor. It was not the intent of the plan sponsor, they urge, to reduce the benefits of loyal employees who were terminated due to a plant shutdown.

The court's response to this argument is as follows. First, this proffered information is inadmissible evidence which the court may not consider on a motion for or an opposition to summary judgment. Fed. R.Civ.P. 56(e); *Schoch v. First Fidelity Bancorporation,* 912 F.2d 654, 662 (3d Cir. 1990); 10A Wright, Miller & Kane, *Federal Practice and Procedure* § 2721 (1983).

---

3. The Supreme Court relied upon the Restatement (2d) of Trusts when it endeavored to ascertain the law of trusts in the *Bruch* decision. *E.g., Bruch,* 109 S.Ct. at 954.

4. The following is from the Affidavit of Mrs. Joan Pastor, Plan Administrator of the 1975 Salaried Plan:

I find no provision in the Plan explaining how a recalculation of the sort proposed by Plan counsel would be implemented in the Qualified Joint and Survivor Annuity. Suppose, for example, that a participant retired under § 4.3(b)(i), receives his benefit in the form of

a Qualified Joint and Survivor Annuity, and that the participant's spouse has died by the time the participant attains age 62. In the normal situation, the death of a surviving spouse does not affect the participant's benefit, but under this recalculation scenario, there must be some method for accounting for the Qualified Joint and Survivor Annuity payments made prior to the spouse's death. Yet there is no instruction in the Plan for such an eventuality.
Pastor Affidavit at 35.

Second, the plaintiffs are here asking for a reformation of the terms of the trust. We note initially that the proffer of this evidence is a virtual admission that it was the intent of the plan sponsor to provide lower benefits for those 30 Year Service employees who retire before reaching age 62. Thus, the plaintiffs would be asking for a reformation of the Plan, based on the proposition that although the drafters intended that the Plan provide lower benefits for retirees under age 62, the drafters neglected to consider whether the differential benefits should be applied in the case of a plant shutdown. Although the Restatement (2d) of Trusts does not directly deal with this point, it appears to indicate that in a circumstance of this sort, a termination, not a reformation, is appropriate.[5] Finally, we do not think that the proffered evidence is reliable enough to establish any intent on the part of the plan sponsor with regard to the contested provision.[6]

█ The plaintiffs' other argument that they should be awarded the recalculation in the presence of an ambiguity rests on the principle of contract law which provides that questions regarding ambiguous language should be resolved according to the mutual purpose of the contracting parties, if the purpose be known.

This assertion raises an interesting point of law. The Supreme Court has indicated that ERISA plans are essentially trusts established by the employer for the benefit of the employees. Therefore, ambiguous language in an ERISA Plan should be interpreted according to the intention of the settlor. *Bruch*, 109 S.Ct. at 955. However, in a recent opinion, the Third Circuit has signaled that adherence to this princi-

ple is not always appropriate. In *Taylor v. Continental Group Change in Control Severance Pay Plan*, 933 F.2d 1227 (3d Cir.1991), the court noted that ERISA severance plans were "often similar to employment contracts, whose interpretation requires determining the intent of both contracting parties," and looked both to the "reasonable understanding of the beneficiaries" as well as the intent of the employer in construing the terms of the Plan. 933 F.2d at 1232–33.

We read the *Taylor* opinion to apply only to severance benefits under an ERISA plan. Although we are not certain where the logic of the *Taylor* opinion leads, we do not read it to authorize the carving of exceptions to the *Bruch* standard whenever a court senses that a particular benefit has more the trappings of a contractual relationship than of a trust-type relationship. We also note that the *Bruch* case involved a claim for severance benefits. *Bruch*, 109 S.Ct. at 951. The "reasonable expectations" of the employees are not relevant to the court's inquiry.

Even if an ambiguity were present in the language of the Plan, which is not the case, the plaintiffs have not established that the application of the "cap" of benefits to 30 Year Service personnel under the age of 62 is contrary to the intention of the plan sponsor.

### D. Analysis of whether the early retirement benefits constitute "liabilities" which must be satisfied under the terms of the Plan.

Although the plaintiffs are somewhat vague regarding the specifics of their sec-

---

5. For example, Restatement (2d) of Trusts § 336 provides that "if owing to circumstances not known to the settlor and not anticipated by him the continuance of the trust would defeat or substantially impair the accomplishment of the purposes of the trust, the court will direct or permit the termination of the trust."

6. The following is the only evidence advanced by the plaintiffs regarding the purpose of the contested provision:

Q. Did you learn subsequent to the effective date of the imposition of the cap what the reason for the cap was?

A. Did I learn?
Q. Yes.
A. Nobody—I don't think anyone ever, you know, gave me an official explanation. However, you know, the thing I heard concerns about, were the fact that, you know, your senior executive is going to a competitor, you know. That kind of thing would encourage them to do that.
Barr Deposition at 31.

ond theory, it is clear that they are contending that the right to the contested benefits derives from the fact that funds may not revert to a plan sponsor until all "liabilities" are satisfied. With respect to the Crucible Plan, this rule has two sources. First, section 12.1(e) of the Plan provides:

> No part of any funds paid to any trustee or insurance company hereunder shall revert to the Company, except that if, after the satisfaction of all liabilities or obligations hereunder, there remain any surplus funds because of erroneous actuarial error or otherwise, then such surplus shall revert to the Company.

Second, ERISA itself provides for a similar rule:

> (1) Any residual assets of a single-employer plan may be distributed to the employer if—
>
> (A) all liabilities of the plan to participants and their beneficiaries have been satisfied

ERISA § 4044(d)(1)(A), 29 U.S.C. § 1344(d)(1)(A).[7]

■ If plaintiffs are advancing the theory that they are entitled to the benefits because such benefits are "liabilities" under ERISA § 4044(d)(1)(A), this court has already held with respect to this very plan that unreduced early retirement benefits do not constitute liabilities under ERISA. *Nobers v. Crucible Inc. 1975 Salaried Retirement Plan*, 760 F.Supp. 464 (W.D.Pa.1990), *aff'd*, 925 F.2d 418 (3d Cir.1991). We believe the reasoning expressed there to be sound and decline to reconsider our decision.

■ We therefore address the proposition that § 12.1(e) of the Plan itself requires that the contested benefits be paid to plaintiffs. Plaintiffs rely on a recent decision by the Fourth Circuit Court of Appeals, *Tilley v. Mead Corp.*, 927 F.2d 756 (4th Cir.1991). In that case, a divided panel held that a plan section which provided that "any surplus remaining in the Re-

tirement Fund, due to actuarial error, after the satisfaction of all benefits rights or contingent rights accrued under the Plan ... shall ... be returnable to [the Company]" obligated the Company to pay unearned early retirement benefits. The court reached this conclusion because "(1) the funds in the Plan that had been set-aside in expectation of fulfilling the unreduced early retirement benefits did not remain in the Plan "due to actuarial error"; and (2) the benefits at issue are "contingent rights" that must be paid prior to any reversion." 927 F.2d at 762.

The Crucible Plan provision is readily distinguishable from the Mead Plan provision at issue in *Tilley*. Unlike the Mead Plan, which provided for a return of any surplus to the Company which was "due to actuarial error," the Crucible Plan provides for the return of "any surplus funds because of erroneous actuarial error or *otherwise*" [sic] (emphasis added). Therefore the first component of the *Tilley* court's reasoning is entirely inapplicable.

The second reason given by the *Tilley* court is scarcely more applicable because the court relied on the provision that all "contingent rights accrued under the Plan" must be satisfied before any surplus could revert to the Company. The court held that the unearned early retirement benefits were "contingent rights" and looked to Treas.Reg. § 1.401–2(b)(2) (1989) for a definition of contingent obligations. 927 F.2d at 763.[8]

In this case, however, section 12.1(e) provides for a reversion after all "liabilities or obligations hereunder" are satisfied and makes no reference to the "contingent rights" of the participants. Therefore, *Tilley* is not directly applicable. In addition, we think that, just as we have held with regard to the meaning of "liabilities" under the terms of the ERISA statute itself, the term "liabilities" is not intended to encompass retirement benefits that plaintiffs

---

7. The term "liabilities" is also used in the Internal Revenue Code at 26 U.S.C. § 401(a)(2).

8. Although Treas.Reg. § 1.401–2(b) actually interprets 26 U.S.C. § 401(a)(2) and not 29 U.S.C.

§ 4044(d)(1)(A), all three members of the panel deciding *Tilley* agreed that the meaning of "liabilities" was the same in the two provisions. *Tilley*, 927 F.2d at 766 (Chapman, J., dissenting).

have not yet qualified for. In the *Tilley* case, the Pension Benefit Guaranty Corporation ("PBGC"), the American Society of Actuaries and the American Academy of Actuaries all submitted *amicus curiae* briefs asserting that it was the long-held understanding of these organizations that unearned early retirement benefits were not "liabilities" of the plan under ERISA. 927 F.2d at 761. It seems likely that this understanding influenced the drafting of the 1975 Crucible Plan. Indeed, given that the purpose of ERISA was to expand protections available to workers, *see Congressional Findings and Declaration of Policy*, 29 U.S.C. § 1001, there is no reason to suspect that the meaning of the term "liabilities" under the terms of the plan itself was intended to be any more expansive than under ERISA.

In addition, to the extent that Treas.Reg. § 1.401–2(b) has any application to "liabilities" of the plan,[9] we think that Judge Chapman's dissent in the *Tilley* case properly observes that Revenue Rulings have interpreted Treas.Reg. § 1.401–2(b) to apply only to "benefit credits *accrued* up to the time of termination of the trust for employees· (and their beneficiaries) who might have become entitled to benefits if the trust had been continued indefinitely." Rev.Rul. 53–33, 1953–1 C.B. 267, 273 *cited in Tilley*, 927 F.2d at 766 (Chapman, J., dissenting) (emphasis added). It has been established in this circuit that ERISA does not provide for the accrual of early retirement benefits, but rather for the accrual only of regular retirement benefits., *Bencivenga v. Western Pa. Teamsters and Employers Pen. Fund*, 763 F.2d 574, 576–80 (3d Cir.1985). Thus, Treas.Reg. § 1.401–2(b) does not provide any support for the proposition that the drafters of the Crucible Plan intended the term "liabili-

ties" to encompass unearned early retirement benefits.

## III. CONCLUSION

The court finds that there are no material disputes regarding the facts surrounding the plaintiffs' substantive claims to an entitlement. No issues remain in the case except pure questions of law.

The court concludes that the plaintiffs' claim that they are entitled to the higher level of benefits given to those employees who had attained the age of 62 at the time of their termination has no merit either under the language of the Plan or under ERISA.

### ORDER OF THE COURT

AND NOW, this 17th day of January, 1992,

IT IS HEREBY ORDERED that the motion for summary judgment filed by the plaintiffs, Edwin L. Marsh, Howard W. Bigleman, Anthony J. DeCosta, John R. Kundick, Theodore T. Lehmann, Robert A. Lippert, Frank S. Matsukas, Lawrence V. Nagle, and William H. Stephens, is DENIED.

IT IS FURTHER ORDERED that ·the motion for summary judgment filed by the defendant, Crucible Inc. 1975 Salaried Retirement Plan, is GRANTED.

· Judgment is entered in favor of the defendant, Crucible Inc. 1975 Salaried Retirement Plan, and against the plaintiffs, Edwin L. Marsh, Howard W. Bigleman, Anthony J. DeCosta, John R. Kundick, Theodore T. Lehmann, Robert A. Lippert, Frank S. Matsukas, Lawrence V. Nagle, and William H. Stephens.

**9.** Treas.Reg. § 401–2(b)(2) provides, in relevant part:

The term 'liabilities' as used in section 401(a)(2) includes both fixed and contingent obligations to employees. For example, if 1,000 employees are covered by a trust forming part of a pension plan, 300 of whom have satisfied all the requirements for a monthly pension, while the remaining 700 employees have not yet completed the required period of service, contingent obligations to such 700 employees have nevertheless arisen which constitute 'liabilities' within the meaning ¡of that term. It must be impossible for the· employer (or other nonemployee) to recover any amounts other than such amounts as remain in the trust because of 'erroneous actuarial computations' after the satisfaction of all fixed and contingent obligations.
26 CFR § 1.401–2(b)(2) (1988).