**Ronald E. ATHEY, Plaintiff,**

v.

**HERCULES INCORPORATED, Defendant.**

**No. CIV. A. 96–209 MMS.**

United States District Court, D. Delaware.

Nov. 14, 1997.

Joseph Grey, Chandlee Johnson Kuhn, Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, DE, for plaintiff.

David J. Margules, Joanne P. Pinckney, Wolf, Block, Schorr & Solis–Cohen, Wilmington, DE, (Robert M. Goldich, Patricia Sons Biswanger, Wolf, Block, Schorr & Solis–Cohen, Philadelphia, PA, of counsel), for defendant.

## *OPINION*

MURRAY M. SCHWARTZ, Senior District Judge.

### INTRODUCTION

On March 13, 1996, plaintiff Ronald E. Athey ("Athey") filed a complaint in the Delaware Superior Court alleging breach of his employment contract, wrongful termination, breach of implied contract, breach of implied covenant of good faith and fair dealing, promissory estoppel, and misrepresentation, all arising out of Hercules' denial of certain benefits to Athey upon his retirement from Hercules. Defendant Hercules removed the

case from the Superior Court on April 18, 1996, on the grounds that this Court has jurisdiction pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 et seq. Plaintiff filed a partial motion for summary judgment on all claims governed by ERISA and defendant filed a motion for summary judgment on Plaintiff's ERISA and state law claims. Plaintiff has since withdrawn all of his state law claims. This Court has jurisdiction under 28 U.S.C. § 1331, federal question jurisdiction, and under 29 U.S.C. § 1132(e)(1), jurisdiction of claims under ERISA. Plaintiff's motion for summary judgment will be granted in part and denied in part. Defendant's motion for summary judgment will be denied.

### STATEMENT OF FACTS[1]

Hercules Aerospace Company ("HAC") was a division of the Hercules Corporation in 1994 when Hercules and Alliant Techsystems, Inc. ("Alliant") began negotiations for the sale of HAC to Alliant. During negotiations, Alliant made clear its intentions to hire most of the HAC employees. D.I. 21 at 200, 266, D.I. 25 at 110–111. Remaining HAC employees were forced to retire or resign from Hercules. D.I. 21 at 158, 162–164; D.I. 30 at 303, 305–306.

Hercules offered two options to employees who lost their jobs by reason of the HAC sale. The first option was to receive severance benefits under the company's long existing Salary Dismissal Plan (identified by defendant as the "Layoff Plan"). This plan states in its introduction: "The Hercules Dismissal Salary plan may provide a benefit if you are ... laid off because the work force is reduced." D.I. 21 at 57. The Plan states that benefits are not paid, however, when "[y]ou are at a location that has been sold and you are offered employment by the new employer." D.I. 21 at 57. Eight HAC em-

ployees received benefits under this Plan as a result of the sale. D.I. 30 at 305.

The sale of HAC included all seven HAC locations. D.I. 25 at 79. The Wilmington office is not identified as a HAC location, although some HAC employees worked there. D.I. 25 at 79. All of the deposed witnesses except one testified that Athey's location was considered to be the Wilmington office. D.I. 25 at 58, 65, 83, 95. Consistent with this understanding, an internal memo discussing Athey's designation within the corporation indicated that he was not employed under a "HAC location code." D.I. 25 at 21. The one remaining witness construed "location" to mean "business location" and stated that he believed Athey's business location was the Aerospace business. D.I. 25 at 107. However, when plaintiff's attorney asked about Athey's physical location, this witness concluded that it was Wilmington. D.I. 25 at 107.

Various Hercules documents buttress the witnesses' testimony and refer to "location" in the physical sense. For example, the Human Resources Agreement ("the Agreement") between Hercules and Alliant describes the location of certain HAC employees as "Wilmington Home Office." D.I. 25 at 20. Hercules' telephone directory lists individuals' locations according to their physical site and lists their department or group separately. D.I. 25 at 24. The company's practice during prior sales, however, was to consider "location" synonymous with "business unit" and not to grant severance benefits to employees who were offered jobs by the unit's purchaser. D.I. 21 at 257–258, 261. Nevertheless, even regarding Athey's business unit, a November 1994 list of "EMPLOYEES *OUTSIDE* HAC" contained Athey's name. D.I. 21 at 68 (emphasis added).

The second option for employees who lost their jobs due to the aerospace sale was to invoke the Voluntary Retirement Incentive Program (labeled by the defendant as the "RIF Plan"), which was designed in response to this transaction.[2] D.I. 21 at 62. Eligible

---

**1.** In a motion for summary judgment, the non-moving party's allegations are usually taken as true. *Valhal Corp. v. Sullivan Assoc., Inc.*, 44 F.3d 195, 200 (3d Cir.1995 ) (citations omitted). With the withdrawal of the state claims, the parties present cross motions for summary judgment. Consequently, where there are disagree-

ments, both sides of the factual issue will be presented.

**2.** During this period, there was an additional RIF Plan offered to "HAC bonus eligible employees" who had not received an offer of regular

employees included "Hercules Aerospace employees in Wilmington who have not received offers of employment." D.I. 21 at 62. In identifying who were Hercules Aerospace ("HAC") employees, Hercules relied on a previously executed "Human Resources Agreement" ("the Agreement") between Alliant and Hercules. Under the Agreement, "HAC employees" were defined as those persons employed "solely in connection with the HAC business."[3] D.I. 21 at 18, 20. Three HAC executives received benefits under this Plan as a result of the sale.[4] D.I. 30 at 303, 305–306.

As part of the Agreement, Hercules needed to "cooperate and pursue all reasonable efforts to assist Alliant in obtaining the continued employment of HAC Employees." D.I. 21 at 21. The Agreement also required Hercules not to "make any change in compensation policy or contribute or make any commitment to, or make any representations that it will contribute, any amounts to any Hercules Employee Benefit Plan or arrangement." D.I. 21 at 51. Several Hercules officials understood these provisions as prohibiting Hercules from offering benefits to employees who were offered jobs by Alliant. D.I. 21 at 274–275. However, Alliant's Vice President of Human Resources perceived these provisions less strictly. D.I. 28 at 85

Athey was a Manager in Hercules' Safety and Loss Prevention Department ("S & LP Department"), which is part of the Operations Support corporate department located at corporate headquarters. D.I. 25 at 24, 58, 65, 101–102. In this capacity, Athey was responsible for monitoring and assisting the safety management systems and programs of different business groups within the corporation. D.I. 21 at 94–95. Starting in 1992,

however, Athey provided support for only one business group within the Hercules Corporation—HAC. D.I. 21 at 95–96. As a result of this focus, Athey spent approximately forty to fifty percent of his time traveling among HAC's seven different locations throughout the country. D.I. 21 at 97–98, D.I. 25 at 45. Accordingly, five of Athey's six "Accountabilities" (i.e., goals/objectives) for 1995 required that he work with HAC safety or site managers in order to support, improve, or monitor their safety and loss prevention efforts. D.I. 21 at 15–17, 107–111, 119–120. Athey's sixth Accountability required him to work with other officials in the S & LP Department on the safety and loss prevention guidelines and engineering standards for the corporation. D.I. 21 at 15–17, 123–127. According to Athey, he also worked with the S & LP Department to develop overall corporate safety and loss prevention goals as well as specific goals for the HAC group. D.I. 21 at 107, 117. Further, Athey responded to safety and loss prevention calls from individuals in departments and business groups throughout Hercules. D.I. 28 at 21, 34–35.

Based on these functions and activities, several officials at Hercules believed Athey fell within the parameters of the Agreement's definition of a HAC employee. D.I. 21 at 69, 191, 213–214, 243–245, 248. In addition, some of the same individuals asserted that even the time he spent on the general corporate guidelines involved, to some degree, his input as a HAC specialist. D.I. 21 at 191–193. Although the S & LP Department paid Athey directly, ninety percent of his costs were then billed to the aerospace company. D.I. 21 at 281. Nevertheless, several of the same witnesses who believed Ath-

---

employment from Alliant. D.I. 30 at 303. "Bonus eligible employees" were apparently those above a certain management level and Athey satisfied this requirement. D.I. 30 at 303, D.I. 28 at 80–81. However, because Hercules categorized Athey as a HAC bonus eligible employee and Athey was offered a job by Alliant, Hercules took the position that Athey did not qualify for this RIF Plan either. D.I. 30 at 303; D.I. 28 at 80–81. Because the issue of Athey's HAC status will be addressed with regard to the general RIF Plan, the Court will not discuss this executive plan separately.

3. The Agreement states under Section 1—Definitions: A. "HAC Employees—means all employees of Hercules or any of the Subsidiaries who are employed solely in connection with the HAC Business...." A–18.

4. These three individuals received benefits under the executive RIF Plan, D.I. 30 at 303, but because the requirements of the executive plan were the same, except for the necessary executive status of the employee, *id.*, the executive RIF Plan will not be separately addressed.

ey was a HAC employee recognized Athey spent at least some of his time on non-HAC matters. D.I. 21 at 212–214, 279. A few of these individuals estimated Athey spent approximately ninety percent of his time on HAC issues. D.I. 25 at 63, 89, 212–214. Moreover, some of the officials did not rely on the Agreement's definition of a HAC employee to decide that Athey should be among those employees offered a job by Alliant. D.I. 25 at 92–93, D.I. 28 at 40. Several of those who stated that Athey should be identified as a HAC employee for purposes of the sale also stated Athey was not employed solely in connection with the HAC business, as the term "solely" is literally defined. D.I. 25 at 63, 89. Moreover, Athey testified that he had responsibilities related to non-HAC matters. D.I. 28 at 21–23, 31–32, 34–35.

Athey received Alliant's offer for the Manager ATK Aerospace Safety position on or about January 16, 1995. D.I. 21 at 284.[5] The offer included similar compensation (slightly lower benefits offset by a temporary increase in pay) but required that Athey move to Minnesota. D.I. 21 at 64. Plaintiff also contends that the offer was not comparable because it included similar remuneration but required greater responsibilities and more work. Furthermore, Athey was going to lose a large portion of his long-term incentive benefits as a result of the transfer. D.I. 25 at 41, 74; D.I. 28 at 65–66.

Alliant gave Athey until January 27, 1996 to decide whether to accept the offer. D.I. 21 at 64. Athey testified in deposition that he recalls Kendall Patterson ("Patterson"), Director of the S & LP Department at Hercules, saying before Athey rejected Alliant's offer that Athey would not be entitled to retirement incentive benefits (under the RIF plan). D.I. 21 at 151–153. Plaintiff asserts, however, that even though he was told informally he was ineligible for the RIF program, he believed that assessment was incorrect. DI. 25 at 47. Athey also testified that officials informed him they believed the terms of the sale precluded Hercules from encouraging Athey to stay at Hercules. D.I. 21 at

152–153, 157, 161–162. Athey claims, however, that it was not until after he had declined the Alliant offer that senior officials at Hercules informed Athey he had been considered a "HAC employee" and, therefore, would lose his job at Hercules no matter what he did. D.I. 21 at 156–158, 176. In addition, at least one of the senior officials told Athey he would see if anything could be changed regarding the benefits or retaining Athey's job at Hercules. D.I. 21 at 160–164, 252, 263–264. Defendant disputes that all of these conversations occurred after Athey declined Alliant's offer. Defendant offers the testimony of one of the officials that prior to Athey's rejection of Alliant's offer, he told Athey that severance payments (under the Layoff Plan) would also be unavailable to Athey because he was not being laid-off. D.I. 21 at 270–272.

Athey declined Alliant's offer on January 26, 1995. D.I. 21 at 66. On February 3, 1995, Athey's ineligibility for the RIF plan (i.e., retirement incentives) was officially conveyed to him in a letter from Edward Carrington ("Carrington"), Hercules' Vice President of Human Resources. D.I. 21 at 61. Subsequently, Athey continued to hope that the various decisions that had been made regarding his employment and his possible benefits would be changed upon Carrington's re-evaluation. D.I. 21 at 164, 167–168; D.I. 25 at 47. Despite no change in the circumstances, however, Athey decided he would retire rather than move to Minnesota. D.I. 21 at 168–169. He chose to retire rather than to resign because there was a greater loss of benefits associated with resignation. D.I. 21 at 162–163; D.I. 25 at 45, 71, 74. As Athey learned from Carrington, those who did not retire would be forced to resign. D.I. 21 at 158, 162–164.

Athey gave notice of retirement on March 13, 1995 and retired on March 14, 1995. The divestiture by Hercules occurred on March 15, 1995. According to Hercules, this late notice required Athey to accept the distribution of certain long-term incentive payments in a lump sum, which had negative tax implications. D.I. 28 at 66–71.

---

**5.** Alliant's Vice President for Administration had sent the offer letter on January 9, 1995, D.I. 21 at 64, but it was sent to officials who did not pass it

on to Athey until January 16, 1995. D.I. 21 at 248.

## STANDARD OF REVIEW

Under the Federal Rules of Civil Procedure, the Court shall grant summary judgment if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute is genuine only if a reasonable jury could return verdict for the non-moving party. *Id.* When considering a motion for summary judgment, the Court must "view all facts and inferences in the light most favorable to the party opposing the motion." *Stephens v. Kerrigan,* 122 F.3d 171, 176–177 (3d Cir.1997).

The Supreme Court has clarified that the moving party must "bear the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). After such a demonstration has been made, however, the nonmoving party must go beyond the pleadings and, based on the same types of evidence, must demonstrate "specific facts showing that there is a genuine issue for trial." Id. at 324, 106 S.Ct. at 2553. The nonmoving party cannot rest on his allegations without "any significant probative evidence tending to support the complaint." *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510 (1986) (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968)).

On cross motions for summary judgment, the same standard and burdens apply. *See Appelmans v. City of Philadelphia,* 826 F.2d 214, 216 (3d Cir.1987); *Peters Township School District v. Hartford Accident and Indemnity Co.,* 833 F.2d 32, 34 (3d Cir.1987). Further, when presented with cross motions for summary judgment, the Court must consider the motions separately. *See Williams v. Philadelphia Hous. Auth.,* 834 F.Supp. 794, 797 (E.D.Pa.1993), *aff'd mem.,* 27 F.3d 560 (3d Cir.1994).

## DISCUSSION

### I. ERISA Claims

The Dismissal Salary ("Layoff") Plan, a long established plan at Hercules, offers severance benefits for those employees who are "laid off because the work force is reduced." The 1995 Voluntary Retirement Incentive Program ("RIF Plan") was designed specifically in response to the Alliant sale and provided retirement incentives to select employees, including HAC employees who did not receive offers from Alliant. The parties agree these plans are employee benefits plans falling within the provisions of ERISA and, therefore, Athey may sue to recover benefits under them. 29 U.S.C. § 1132(a)(1)(B). In addition, the parties agree that Athey's challenge to his denial of benefits should be reviewed under a de novo standard. *Firestone Tire & Rubber v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989).[6] The center of the dispute, therefore, centers around two issues: first, whether Athey qualifies for benefits under either of the two benefits plans; second, whether the court has the authority to review Hercules' interpretation and application of the Agreement with Alliant to the extent that the interpretation affects the applicability of the RIF Plan.

### A. Entitlement to Benefits under the Layoff Plan—severance benefits

In order to ascertain whether Athey is entitled to benefits under the Layoff Plan, the Court must analyze, first, whether Athey was eligible for the Plan and, second, wheth-

---

**6.** The Supreme Court has held that "a denial of benefits challenged under 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Bruch,* 489 U.S. at 115, 109 S.Ct. at 956–57. The plans in this case do not give the administrators such discretionary authority.

er Athey, even if eligible, was excluded from the Plan. When discussing Athey's eligibility, the court will begin with a legal framework for the eligibility requirement and will then break down the requirement into its two primary components in order to analyze the facts of the case.

1. *Eligibility: Was Athey "laid off because the work force [was] reduced" ?*

The Dismissal Salary Plan states that an employee qualifies for benefits if he is "laid off because the work force is reduced." D.I. 21 at 57. Defendant argues that because Athey was offered a job with Alliant, voluntarily rejected the offer, and chose to retire rather than be involuntarily terminated (i.e., forced to resign), Athey was never "laid off." In addition, regardless of Athey's actions, his position was not terminated, it was transferred. Defendant also contends that Hercules' workforce was not reduced, it was merely transferred to Alliant.

Plaintiff argues that he was forced to resign or retire, which effectively constituted a lay off (i.e., a constructive discharge), notwithstanding the offer from Alliant. This unavoidable termination also constituted a "lay off" based on the standard definition of the term, which the Plan does not alternatively define. The fact that Athey declined Alliant's offer because he did not want to take on additional responsibilities for the same income or to move to Minnesota does not alter the character of the termination. Plaintiff also argues the sale itself was a means of reducing Hercules' work force, as confirmed by the fact that some employees lost their jobs and were not hired by Alliant. Further, the Layoff Plan was offered to some HAC employees who lost their jobs during this sale, supporting the claim that, in certain instances, Hercules considered the aerospace division sale to be a reduction in force.

■ The analysis begins by disposing of those arguments that obfuscate the resolution of Athey's rights under the Layoff Plan. First, although defendant stresses plaintiff's prior intentions to retire and his subsequent choice to retire, these facts are not fatal to plaintiff's claim. If the circumstances surrounding Athey's termination are considered a work force reduction and if the defendant's

offer of retirement or resignation is considered a lay-off despite the offer from Alliant, then the fact that plaintiff intended to and did retire is immaterial. The Third Circuit Appellate Court concluded in *Haeffele v. Hercules Inc.*, 839 F.2d 952 (1988), that someone's prior intention to retire does not preclude him from receiving retirement incentive benefits as long as he is eligible for them. *Id.* at 954–955. This is true even if the employee postpones his retirement to take advantage of the opportunity. *Id.* Unless there is a clause excluding individuals who have already decided to retire, the only inquiry should be whether the person is eligible under the requirements of the plan at the time he invokes its benefits. *Id.*

■ Plaintiff and defendant also invest much time arguing over whether plaintiff learned about his exclusion from certain benefits plans and the unavoidable loss of his Hercules job before or after he made his employment decisions. This debate, however, is irrelevant. ERISA does not require a showing of prejudice to the plaintiff beyond the fact of being wrongfully denied benefits. In a somewhat different scenario, the Third Circuit Court of Appeals recognized that if a plaintiff's actions arguably preclude application of a plan but those actions were based on the defendant's erroneous interpretation of its own plan, the plaintiff should not be excluded from the plan. *Epright v. Environmental Resources Management, Inc.*, 81 F.3d 335, 341 (1996). In the case at bar, even if various officials told Athey he was ineligible for benefits before he made a final decision regarding retirement and Alliant's offer, he clearly believed defendant's interpretation was erroneous. Applying the general reasoning of *Epright*, the fact that Athey did not guide his actions based on what he believed to be an incorrect application of the benefits plans should not prejudice him if the benefits were wrongfully withheld. Regardless of what anyone told Athey the month before or after he made his decision, he is not precluded from recovering benefits if he was in fact eligible to collect them.

■ Turning to the meaning of the phrase "laid off because the work force is

reduced," it has long been established that "[w]hether an ERISA plan is ambiguous is a question of law." *In re Unisys Corp. Long-term Disability Plan ERISA Litigation,* 97 F.3d 710, 715 (3d Cir.1996) (quoting *Alexander v. Primerica Holdings, Inc.,* 967 F.2d 90, 92 (3d Cir.1992)). Further, the " 'strongest external sign of agreement between contracting parties is the words they use in their written contract.' " *In re Unisys,* 97 F.3d at 715 (quoting *Mellon Bank, N.A. v. Aetna Business Credit, Inc.,* 619 F.2d 1001, 1009 (3d Cir.1980)).

According to Webster's Third New International Dictionary, Unabridged (1971), to "lay off" means "to cease to employ (a worker) usu. temporarily because of slack in production and without prejudice to the worker...." "Reduction in force" means "a process of reduction of personnel ... esp. for reason of economy...." *Id.*

Various appellate court decisions teach that, depending on the language of the plan and the facts of the case, these or similar phrases may or may not include the circumstance in which a company sells a division and the employee continues his job with the purchaser. *See, e.g., Bradwell v. GAF Corporation,* 954 F.2d 798, 800 (2d Cir.1992) (employees who continued working at the same facility for the purchaser were not "permanently laid off because of lack of work")[7]; *Harper v. R.H. Macy and Co.,* 920 F.2d 544, 545 (8th Cir.1991) ("employees who continue[d] to work without interruption on comparable terms for the purchaser ... have [not] been 'permanently terminated' " within the meaning of the benefit plan); *Rowe v.*

*Allied Chemical Hourly Employees' Pension Plan,* 915 F.2d 266, 269 (6th Cir.1990) ("plaintiffs' separation from Allied and immediate employment with Armco ... did not constitute a layoff"). *But see, e.g., Bellino v. Schlumberger Technologies, Inc.,* 944 F.2d 26, 30–33 (1st Cir.1991) (maintenance workers who were terminated by one employer upon cancellation of a maintenance contract and subsequently rehired by another, and who continued to perform the same work without missing a day of employment, were "terminated" due to "lack of work" and were entitled to severance pay); *Harris v. Pullman Standard, Inc.,* 809 F.2d 1495, 1498–99 (11th Cir.1987) (employees offered jobs by purchaser company satisfied plan granting severance pay "for all involuntary terminations, other than lay-off," where "lay-off" was defined as separation from employer with the intention of later recall); *Blau v. Del Monte Corp.,* 748 F.2d 1348, 1354–55 (9th Cir.1984) (when alternative employment is not available with the original corporation, employees of purchased company are entitled to severance under plan that provides coverage when jobs are "eliminated").[8]

The Third Circuit Court of Appeals has also demonstrated the potential for more than one interpretation of the same or similar language based on the specifics of the plan and the facts at issue. In *Bruch v. Firestone Tire and Rubber Company,* 828 F.2d 134 (3d Cir.1987), *rev'd on other grounds,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the court confronted the meaning of a plan which granted severance pay if an employee's "service is discontinued ... because of a reduction in work force."

---

7. *Bradwell* comments on defendant's concern regarding the "windfall" that would come to "employees who never changed their jobs and were never out of work." 954 F.2d at 801. However, this issue is more relevant to some plan language and some factual scenarios than others. For example, in the case at bar, defendant has excluded from the Layoff Plan those employees whose "locations are sold" and who are even "offered" employment by the purchaser. *See* p. 24. Clearly Hercules has accounted for this concern and prevented a windfall. Moreover, Athey's case presents unique circumstances that must be resolved based on the plans established by the defendant, not based on general policy concerns that could have been resolved by the company with different plan language.

8. *See also Devine v. Xerox Corp.,* 668 F.Supp. 351, 356–357 (D.Del.1986) (holding that employee's resignation following employer's disciplinary actions, which in the past had led to other employees' terminations, was a "resignation at the request of the company" even though the company had not explicitly requested such action, thereby entitling employee to severance pay). Applying this reasoning to the language in Hercules' Lay-off Plan, it is clear that Athey's forced choice between resignation and retirement could be considered a layoff, despite the fact that the separation technically occurred by virtue of his own action. Of course, the impact of Alliant's job offer is a separate issue.

*Id.* at 146. The employees claiming benefits under this plan had been part of a division that had been sold by the company and most of the employees had offers to continue their positions with the new company. *Id.* at 136. Most of the plaintiffs had accepted the offers. *Id.* Although the court did not resolve the issue but rather remanded the case to the district court, the Appellate Court indicated that, at least in some cases, severance pay based on a "reduction in force" may be merited when assets are sold as a going concern and employees retain their jobs. *Id.* at 146–148. For example, severance pay may be awarded "even if employees remain employed if their compensation drops substantially when the employees cease to work for the employer." *Id.* at 147.

Two years later in *Ulmer v. Harsco Corp.*, 884 F.2d 98 (3d Cir.1989), the court construed a plan granting severance play "when employment is terminated" in the context of an employer's sale of a division as a going business. *Id.* at 99–100. The employees involved retained the same jobs, shifts, wages, and supervisors but the terms of their employment were significantly worse in several respects. *Id.* at 101. The company, however, had a past practice of not granting severance benefits to employees who were terminated and hired by the purchaser. *Id.* at 100. The court held that despite their continuous employment, the employees had been terminated from their jobs with the former employer and, therefore, were entitled to severance benefits. *Id.* at 103–104.

Similarly, in *Kotrosits v. GATX Corp.*, 970 F.2d 1165 (1992), the Third Circuit Appellate Court addressed whether employees were wrongfully denied special early retirement benefits upon the sale of a subsidiary for which they worked. In that case, the pertinent part of the benefits plan granted such benefits in the event of "plant shutdown, layoff, extenuating circumstances or disability...." *Id.* at 1167. A separate clause elaborating on this portion of the plan granted benefits to employees who had experienced "Termination of Employment due to permanent shutdown of a plant, department or subdivision thereof, or due to layoff or disability...." *Id.* at 1168. The closing date of the sale effected a termination of employment by the original owner of the subsidiary. *Id.* As in *Ulmer,* the company had not granted similarly situated employees such benefits in past sales. *Id.* at 1170. In this case, however, the affected employees remained employed "by the same company, under the same management, at the same place, doing the same jobs, under the same conditions, for the same direct compensation" and did not experience any days of unemployment. *Id.* They did not, however, know whether they had jobs until the morning they needed to report to work with the new company. *Id.* at 1169–70. Furthermore, their benefits deteriorated somewhat. *Id.* at 1170.

The *Kotrosits* court agreed with the district court that a "layoff" constituted a "temporary suspension of employment at the will of an employer," but held that an employee "who has lost no work time or salary cannot be said to have been 'suspended from work' or 'laid off.'" 970 F.2d at 1171. Nevertheless, the court noted that although the "most common understanding of a layoff is a situation involving a loss of work time and direct compensation, ... severance pay benefits may be intended to compensate an employee for the possibility of lower salary and benefits even when his or her employment continues without interruption with a new employer." *Id.* (citing *Ulmer,* 884 F.2d at 103; *Bruch,* 828 F.2d at 146). Reviewing the company's decision under the more deferential arbitrary and capricious standard, however, the court held that it was reasonable, although not necessarily more accurate, to exclude employees who did not lose work time or direct compensation. 970 F.2d at 1176–1177.

Reviewing these decisions, it is apparent the Layoff Plan's phrase "laid off because the workforce is reduced" is subject to more than one reasonable interpretation and, therefore, is ambiguous. *See Taylor v. Continental Group Change in Control Severance Pay Plan,* 933 F.2d 1227, 1232 (3d Cir.1991). When terms are deemed ambiguous, severance plans, like employment contracts, demand a discernment of the contracting parties' intent. *See Bruch,* 828 F.2d at 145. When it does not appear, however,

that the Plan "was the product of explicit bargaining between" the employer and the beneficiaries, the plan is "in essence [a] unilateral contract[ ]," making it difficult to determine the true "intentions" of both parties. *Taylor*, 933 F.2d at 1232. It is unclear of record whether the Layoff Plan is a unilateral contract. Assuming the Plan is a unilateral contract, the *Taylor* court indicated that "the reasonable understanding of the beneficiaries, as well as the intent of the employer, may be admissible to clarify ambiguities." *Id.* at 1232–1233. The understanding of both parties may be gleaned from past practices, usage in the trade, and other relevant evidence. *See Taylor*, 933 F.2d at 1233. As *Bruch* explained, however, although past practices, usage of trade, and other manifestations of promises or agreement should help discern the meaning of a unilateral contract, these sources may show that there never was an agreement about what the contract meant. *See* 828 F.2d at 147. In a case in which the drafter's intent and the beneficiaries' understanding are in disagreement, the court must "adopt the most reasonable understanding of the term." *Id.* at 148. Within this legal framework, the Court will analyze the arguments and record evidence presented by the parties regarding each of the two key phrases that constitute the eligibility provision of the Layoff Plan.

#### a. *"Laid-off"*

As evidence of defendant's intent, defendant asserts its past practices demonstrate Hercules did not consider employees who were offered jobs by purchasers to be "laid off." These past practices, however, are given cursory record development that does not advance the inquiry into whether Athey's circumstances constituted a lay-off. For example, the record does not indicate the comparability of employment and compensation offered the employees in these past transactions.[9] Arguably, the increase in responsibilities alleged in this case[10] could constitute a

reduction in compensation if the salary remained the same for more work. In addition, it is unclear whether Hercules' past sales required employees to re-locate as Athey was required to do. Moreover, Athey was definitely going to lose a large portion of his long-term incentives. As a result, Athey's overall compensation would diminish, yet there is no evidence indicating whether such a loss of benefits existed in past transactions. These various issues cannot be resolved with the limited record provided on past practices but they are relevant to whether termination followed by an offer of continuing employment is a "lay off."

Not only are the past practices unclear, but the record is silent as to usage of trade, if there be any germane to this litigation. Moreover, other than Athey's belief in his eligibility, there is no evidence regarding the understanding of the beneficiaries. It is therefore held the meaning of the phrase "laid off," as used in the Layoff Plan, cannot be ascertained on these cross motions for summary judgment.

#### b. *Reduction in force*

Defendant asserts its past practices of denying severance pay to employees similar to Athey also demonstrate that sales of divisions are not reductions in force as the Layoff Plan intended that phrase to be used. However, the circumstances around these past sales remain unclear and the record provides little evidence about who did and did not receive such benefits.

Moreover, the fact that Hercules provided severance pay under the Layoff Plan to some HAC employees who lost their jobs demonstrates Hercules believed these employees satisfied the "reduction in force" requirement and raises additional questions about past practices. At oral argument, defendant stated that the eight employees who received benefits under the Layoff Plan were unique because they lost their jobs without an offer

---

**9.** Defendant argues that whether Athey's offer is comparable is not relevant to whether he satisfies the *exclusion* to the Layoff Plan discussed later in the opinion. Although defendant is correct, the comparability is very relevant to Athey's *eligibility* (i.e. whether Athey's termination constituted a layoff).

**10.** There is insufficient information in the record to determine to what degree Athey's responsibilities or duties would have increased.

of continuing employment. While these employees' job losses may distinguish them from Athey with regard to the "laid off" component of eligibility, such a loss is less relevant to the work force reduction component of eligibility. Hercules also distinguished these eight employees by the fact that Alliant agreed to reimburse Hercules for the cost of their severance benefits. However, who bore the financial burden is irrelevant. What is germane is that the only reason these employees received severance benefits was because Hercules decided they satisfied the eligibility requirements of the Layoff Plan. Their eligibility was unaffected by the fact that Alliant reimbursed Hercules.

Hercules has another obstacle impeding acceptance of its argument that sale of the aerospace division was not a reduction in force. Hercules continuously characterizes the voluntary early retirement incentive program designed in response to the HAC sale as a "RIF" (reduction in force) Plan. This choice cannot be overlooked as irrelevant to Hercules' perception of the events that transpired, at least with respect to those employees who did not go to work for Alliant. Although at oral argument Hercules tried to distinguish a "voluntary" RIF from an "involuntary" RIF, this distinction is not helpful.[11] The Layoff Plan does not distinguish between types of reduction in force. As a result, with regard to the work force reduction issue, Hercules' practices are incompletely outlined, usage of trade, if applicable, is not discussed, and there is little evidence of the beneficiaries' understanding outside of Athey's individual claims. Consequently, the Court cannot resolve on summary judgment the meaning of the phrase "work force is reduced" within the context of the Layoff Plan.

Regarding both the phrase "laid off" and the phrase "reduction in force," Hercules asserts the Agreement mandates denying benefits to employees offered jobs by Alliant. The Agreement, however, is ambiguous and does not control the outcome. First, the Agreement requires Hercules to "cooperate and pursue all reasonable efforts to assist Alliant in obtaining the continued employment of HAC Employees." D.I. 21–21. This language is ambiguous regarding who may receive benefits under the Layoff Plan. Defendant also points to the part of the Agreement which requires Hercules not to "make any change in compensation policy or contribute or make any commitment to, or make any representations that it will contribute, any amounts to any Hercules Employee Benefit Plan or arrangement." D.I. 21 at 51. This language also does not clearly define the parameters in which Hercules could apply its already existing Layoff Plan. The fact that Alliant's Vice President of Human Resources stated Alliant would not have cared if Hercules had reversed its designation of Athey as a HAC employee and had given him dismissal pay shows that even Alliant may not have shared Hercules' strict reading of the Agreement. Further, defendant presents no evidence that this Agreement was available to the employees. Consequently, while this language contributes to the debate over whether defendant intended certain employees to be eligible under the Layoff Plan, it does not unilaterally resolve the debate by negating consideration of the beneficiaries' understanding of the plan.

Finally, even if the Agreement technically precluded Hercules from considering certain employees eligible for the Layoff Plan, such extrinsic evidence cannot control the decision, even if it informs Hercules' intent. The Layoff Plan was an ongoing benefits plan which was not amended at any point during this transaction. Hercules may not rely on a subsequent contract with Alliant to undermine ERISA and deny benefits to an individual who is otherwise eligible for the Plan.

The Court concludes the phrase "laid off because of a reduction in force" is ambiguous. Further, relying on the mandate of the Third Circuit Appellate Court's opinions in *Taylor and Bruch*, the Court has insufficient information regarding usage of trade (if applicable), past practices, and other manifesta-

---

11. As Hercules acknowledged at oral argument, the executives who took the RIF Plan over the Layoff Plan did so because the benefits were greater. Saying their retirement was "volun-tary" because they "chose" to retire to receive better benefits rather than be "laid off" "involuntarily" does not advance the inquiry.

tions of the parties' understandings and commitments to discern the phrase's meaning on a motion for summary judgment. If these sources do not provide evidence of an agreement as to the meaning of the disputed phrase, the Court will substitute a reasonable interpretation of the phrase. Consequently, summary judgment on the eligibility of Athey for the Layoff Plan is denied for both parties.

### 2. *Exclusion: Was Athey's "location sold"?*

▇ The Layoff Plan excludes from coverage employees who "are at a location that has been sold and ... are offered employment by the new employer." [12] D.I. 21 at 59. Defendant argues that HAC, as a "business unit," constituted a "location" for purposes of this provision, and the term "location" has had this significance in a series of business sales. D.I. 21 at 256–258. Therefore, because HAC (i.e., a location) was sold to Alliant and Alliant offered Athey a position, Athey is excluded from coverage. Hercules also argues that plaintiff's construction of the term "location" to mean physical location would lead to the problematic result in which people who transferred to the new company would receive severance pay because their physical location was leased rather than sold to the new company.[13]

Plaintiff contends that numerous corporate documents refer to location as a physical site and offer business group information under a separate heading. Plaintiff also notes that no document has been presented that designates HAC as a location or that characterizes location as a business group. Consistent with this physical site construction, numerous

individuals in the corporate office as well as corporate documents indicated Athey's location was the Wilmington office. Further, for purposes of the sale, the Wilmington office was not considered to be a HAC location and was not sold. Finally, plaintiff argues that the plain definition of "location" allows only for the interpretation related to a physical site.

Even if location were to mean business unit as defendant contends, however, Athey would not be excluded by this provision of the plan. In arguing over the applicability of the separate RIF Plan, defendant dismisses Athey's arguments that Athey's technical employer (i.e., the entity that directly paid him and under whose departmental structure he sat) was the Hercules Operations Support Department within the corporate group. Hercules rebuts this argument by stating that "the inquiry is not whether Athey worked *for* HAC, but whether he worked *solely in connection with* HAC." D.I. 20 at 22 (emphasis in original). For purposes of the Layoff Plan, however, identifying for whom Athey worked is not only relevant, it is controlling. It is undisputed Athey was employed not by HAC but rather by the Hercules corporate office. Regardless of the degree of his connection with HAC, he was not a member of the HAC business unit, as confirmed by all of the evidence, including a November 1994 list of "EMPLOYEES OUTSIDE HAC" which contains Athey's name. Consequently, even if the HAC business unit was the "location" sold, Athey was not "sold."

Hercules stressed at oral argument that Athey was, during the last few months of his

---

12. Athey argues that the comparability of his Hercules job and Alliant offer is relevant to whether he was "offered employment" because Alliant and Hercules agreed that the offers would be comparable. However, the language of the Agreement is general enough and the deference accorded Alliant's judgment is broad enough that it does not appear Hercules' claim should fail on this basis at this procedural stage. The Agreement states that

Alliant or a subsidiary thereof will offer to transfer employment on an at-will basis to all HAC Employees on terms and conditions that, in the reasonable judgment of Alliant after due inquiry, are in the aggregate comparable to those applicable to such HAC Employees on

the Closing Date, subject to the terms of this HR Agreement.
D.I. 21 at 20–21.

13. Defendant also argues that the physical location construction is absurd because it would lead employees at several of the HAC sites not to receive severance pay, although they should receive it, just because their physical locations were sold. This argument fails. Those employees at the HAC sites who were not offered jobs would still be entitled to such pay because they would not satisfy the second half of the exclusion. If they were offered jobs, then they would clearly satisfy both halves of the test and properly be excluded.

employment, considered a "HAC employee" for purposes of the sale. As a result, defendant argues, Athey was a member of the HAC business unit at the time of the sale. This argument must fail. Defendant concedes that, at all times, Athey remained an employee of the corporate office. He continued to be paid by the corporate office and to be listed as an S & LP Department employee. There has been no assertion anything changed for Athey regarding his placement or role in the company. As someone largely connected to HAC, Athey may have been an additional part of the "package" to be transferred, but this fact does not convert him into a member of the HAC business unit. As a result, without deciding the ambiguity or meaning of the term "location," the Court grants summary judgment to plaintiff on the exclusion provision of the Layoff Plan.

## B. Entitlement to Benefits under the RIF Plan—retirement incentive benefits

The Voluntary Retirement Incentive Plan ("RIF Plan") covers "Hercules Aerospace employees in Wilmington who have not received offers of employment from Alliant." D.I. 21–62. The announcement of the Plan is dated February 3, 1995. The Human Resources Agreement, executed before the RIF Plan was implemented, contains a definition of "HAC employees" that includes those individuals who are employed "solely in connection with the HAC business." D.I. 21 at 18. Defendant and plaintiff dispute whether defendant's interpretation of the Agreement is reviewable and, if so, whether Athey is covered by this definition.

### 1. *Reviewability*

■ Defendant contends plaintiff is not permitted to challenge defendant's interpretation of the Agreement and, even if such a

challenge were allowed, defendant's intent should control. First, this argument puts the cart before the horse. The Court's review under ERISA must focus on whether or not benefits have been wrongfully denied to plaintiff under the RIF Plan. As has been discussed, this analysis begins with the relevant plain language of the RIF Plan, not the Agreement, and plaintiff has standing to challenge the application of the RIF Plan to him. Only if the Court determines that the pertinent language of the Plan is ambiguous as a matter of law may the Court turn to alternative sources, such as the Agreement, to ascertain the meaning of the language.

Second, if necessary, the Court may interpret these alternative sources for purposes of determining the RIF Plan's application to plaintiff, whether or not plaintiff would have standing to challenge those sources independent of the ERISA claim. It would undermine the protective purposes of ERISA[14] if an employer could avoid a court's review of its eligibility determinations by defining the terms of an ERISA plan in an independent contract and then claiming its subjective interpretation of the contract must govern. This is especially true in a case where the defining contract has not been provided to the employees.

■ Third, unlike the "arbitrary and capricious" standard applied when a plan explicitly grants the administrator discretionary authority to determine eligibility and construe the terms, the de novo standard does not defer to the administrator's interpretation. On the contrary, the de novo standard does not favor either party's interpretation. *See Bruch,* 489 U.S. at 112, 109 S.Ct. at 954. "[P]arties remain bound by the appropriate objective definition of the words they use to express their intent.... [C]ommon words of accepted usage and terms of a

---

14. Section § 404(a)(1) provides: [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—(A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; ... (B) with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character

and with like aims; ... and (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [ERISA].

In other words, ERISA was clearly "designed to promote the interests of employees and their beneficiaries in employee benefit plans...." *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 90, 103 S.Ct. 2890, 2896, 77 L.Ed.2d 490 (1983).

similar nature should be interpreted in accord with their specialized or accepted usage." *In re Unisys Corp.*, 97 F.3d at 716. "To rely upon the [plan drafter's] subjective intent does not 'provide contracting parties with a legal framework which provides a measure of predictability.'" *Id.* (quoting *Mellon Bank*, 619 F.2d at 1009).[15] Even if the Court determines the relevant terms are ambiguous, then collateral evidence, including both drafters' intent, or, in the case of a unilateral contract, the drafter's intent and the beneficiaries' understanding, will be considered. *See Bruch*, 828 F.2d at 147–148; *Taylor*, 933 F.2d at 1232–33. Further, if the contract is unilateral and the drafter's intent and the beneficiaries' understanding are in disagreement, the court must "adopt the most reasonable understanding of the term." *Bruch*, 828 F.2d at 148.

### 2. Applicability of the RIF Plan to Athey—Is Athey a "Hercules Aerospace employee" ?

■ The RIF Plan states that eligible employees include "Hercules Aerospace employees in Wilmington who have not received offers of employment from Alliant." D.I. 21 at 62. The critical dispute centers around whether Athey is a "Hercules Aerospace employee" ("HAC employee") for purposes of this plan. Initially, it would appear that this term is unambiguous. "Employee" means "anyone employed by another . . . usually for wages." Websters Third New International Dictionary, Unabridged (1971). Nevertheless, as recognized by the Third Circuit Court of Appeals in *In re Unisys*, in "situations where the parties use words differently from their common meaning . . . the judge will 'hear the proffer of the parties and determine if there is objective indicia that, from the linguistic reference point of the parties, the terms of the contract are susceptible of

different meanings.'" 97 F.3d at 715 (quoting *Mellon Bank*, 619 F.2d at 1011).

■ The parties have presented objective evidence—the Agreement—that the term "HAC employee" as it was used in the RIF Plan has a reasonable alternative interpretation because it took on special meaning for this particular transaction. The Agreement defines "HAC employee" as someone who is employed "solely in connection with the HAC business." Because this operational definition is found in a contract, the meaning of the phrase must first be gleaned from the language itself. *See Citadel Holding Corporation v. Roven*, 603 A.2d 818, 822 (Del. 1992). *Accord Kaiser Aluminum Corp. v. Matheson*, 681 A.2d 392, 395 (Del.1996). Only if the language is "reasonably or fairly susceptible of different interpretations or may have two or more meanings" will the Court look to collateral sources. *Kaiser*, 681 A.2d at 395. *Accord Citadel*, 603 A.2d at 822. The Court will give words their ordinary meaning, i.e., what a reasonable person in the position of the parties would have thought it meant, unless a different intent appears. *See Citadel*, 603 A.2d at 824; *Kaiser*, 681 A.2d at 395.

Both parties agree this definition is unambiguous. The parties concede that the ordinary meaning requires Athey's relationship to and work with the HAC group to be his exclusive function and no other intent appears on the face of the contract. Because the Court agrees this definition is unambiguous and no party has presented evidence to the contrary, no evidence outside of the language of the contract should be considered.

■ The dispute then, unlike that under the Layoff Plan, centers not around the meaning of the language but rather around whether the language applies to Athey (i.e., whether Athey satisfies this definition of a HAC employee).[16] Accepting both parties'

---

**15.** " 'If the Plan language were in fact ambiguous the subjective intent of the plan's sponsor might, along with other evidence [such as the prior treatment of such benefits], be relevant in ascertaining its meaning.' (citation omitted). However, the undisclosed, subjective intent of the draftsman cannot be relied upon to render unambiguous language ambiguous." 97 F.3d at 716.

**16.** Because the following facts are more detailed than those provided in the Statement of Facts, citations will be used for specific information that was only generally discussed earlier.

Also, defendant argues that previously discussed parts of the Agreement preclude application of the RIF Plan to Athey because the benefits would discourage him and similarly situated individuals from accepting Alliant's offer. *See p.*

version of the facts on cross motions for summary judgment, the record reflects the following evidence. Athey spent about 40 to 50 percent of his time traveling among the seven HAC location and the only business group he has supported since 1992 is HAC. In addition, Carrington believed Athey fell "within the reasonable definition" of people who are employed solely in connection with the HAC business. D.I. 21 at 69. Carrington also stated Athey was always mentioned as someone who was solely assigned to Aerospace. D.I. 21 at 248. Carrington further noted that because Athey's time was being charged to HAC he was considered to be a HAC employee. D.I. 21 at 243–245.

Five of Athey's six accountabilities involved working directly with the HAC business and his sixth accountability involved working with corporate standards and guidelines. D.I. 21 at 15–17. It remains unclear, however, how much Athey's aerospace expertise was used in this capacity. James Beach ("Beach"), Hercules' Vice President of Operations Support, said Athey was 100 percent Aerospace and Athey's work on the corporate standards and guidelines was based on his aerospace expertise. D.I. 21 at 191–193. Beach acknowledged, however, that he did not know about the Agreement's definition of a HAC employee when he classified Athey as one. D.I. 28 at 40. Also raising a genuine factual dispute about Athey's guidelines work was Patterson. While agreeing with Beach that Athey's work on the standards and guidelines involved some of his Aerospace perspective, D.I. 21 at 280–281, Patterson stated that this responsibility fell outside of Aerospace. D.I. 21 at 279. Because some of the standards and guidelines were not aerospace related and this project was done for the Hercules corporation rather than for HAC, Patterson considered this responsibility to be an exception to Athey's aerospace work. D.I. 21 at 279. When directly asked if Athey worked solely for HAC, Patterson responded that Athey worked the "vast majority" for HAC. D.I. 25 at 63. When

pressed for a number, Patterson said "90 plus" percent for HAC. D.I. 25 at 63. Patterson also clarified Carrington's statement by saying that 90 percent of Athey's costs were charged to HAC. D.I. 25 at 64. Patterson further stated that although Athey did not work 100 percent for HAC, it was clear to him that Hercules was interpreting the HAC employee definition as meaning that the individual worked the "vast majority" of his time for aerospace. D.I. 25 at 64.

Peter Bukowick ("Bukowick"), HAC's Vice President of Technology, said he and the people he talked to never doubted Athey worked solely for HAC. D.I. 21 at 214. When pressed by plaintiff, however, Bukowick acknowledged that he put Athey's name on the list of people who should go to Alliant before the Agreement's definition of a HAC employee was developed. D.I. 25 at 92–93. In addition, Bukowick conceded Athey did spend some time working on non-HAC issues. D.I. 21 at 212–214. When confronted with whether Athey worked solely for HAC, Bukowick responded that Athey was a corporate employee and about "90 percent of his work was performed for HAC." D.I. 25 at 89. Approximately ten percent of Athey's time, according to Bukowick, was spent reporting to the corporation and working on general safety policy. D.I. 21 at 212–214. Bukowick said nobody felt Athey spent more than ten percent of his time on non-HAC issues. D.I. 21 at 212–214. Bukowick remarked, however, that the term "solely" does not mean 100 percent to him. D.I. 25 at 89.

Athey himself testified that he helped develop safety goals for the overall corporation as well as for HAC in particular. D.I. 21 at 107. In addition, Athey took safety and loss prevention related calls from numerous individuals in different departments and business groups throughout Hercules, not just from the HAC locations. D.I. 28 at 21, 34–35. Athey explained his work on the guidelines was done with the S & LP Director and he did not work on the committee in a HAC representative capacity. D.I. 28 at 23. He

23. Although the Agreement's definition may preclude application of the RIF Plan to "HAC employees" offered jobs by Alliant, the entire dispute under this plan revolves around whether or not Athey is in fact a HAC employee. To argue that Athey should not receive benefits under the RIF Plan because Hercules identified him as a HAC employee and, therefore, such payments would contravene the Agreement, is unacceptable bootstrapping.

stated that the committee consisted of five people selected to review the guidelines and membership was not dictated by business group association. D.I. 28 at 23. Somewhere around four to five hours, two to four times a month, were spent on the guidelines and standards committee. D.I. 28 at 23. He also worked as a member of an educational Proact committee, which was part of the same Corporate Safety Management System for which the guidelines work was conducted. D.I. 28 at 22.[17] Through this committee he trained individuals throughout Hercules' sites around the world in safety and loss prevention issues. D.I. 28 at 23. In addition, on some forms created for and entitled the "HAC SALE/PURCHASE," Athey was identified as being accountable for "Hercules," not for "Aerospace." D.I. 25 at 31–32.

Although the evidence predominantly indicates that Athey was not employed "solely in connection with HAC," it appears that there is a genuine factual dispute over this determination. Plaintiff's and defendant's motions for summary judgment on this issue will be denied.[18]

## II. Damages

Because the Court has not granted summary judgment on enough issues to make a damages determination, summary judgment will be denied for plaintiff on the issue of damages.

## III. Attorney's Fees

Because the Court has not granted summary judgment on enough issues to determine whether or not plaintiff is entitled to attorney's fees, summary judgment will be denied for plaintiff on the issue of attorney's fees.

### CONCLUSION

Finding that the terms of the Layoff Plan are ambiguous and there is a genuine factual

17. The deposition testimony is unclear about whether Athey was working on the Proact Committee when the determination was made as to his HAC status.

18. Because the Court denies summary judgment on this issue, it is unnecessary to decide the significance of Hercules' granting RIF benefits

dispute as to their meaning, the Court will deny summary judgment for both parties on the issue of Athey's eligibility for benefits under the Layoff Plan. The Court determines, however, that Athey is not covered by the exclusion to the Layoff Plan invoked by Hercules; consequently, summary judgment for Athey will be granted on this issue. Regarding the RIF Plan, the term "HAC employee" is ambiguous and, although the meaning of the phrase can be definitively ascertained, there is a genuine factual dispute as to whether the phrase applies to Athey. As a result, summary judgment will be denied on the issue of Athey's eligibility for benefits under the RIF Plan. Finally, the outcome of these motions for summary judgment precludes summary judgment for plaintiff on either his claim for damages or his claim for attorney's fees.

to Melvin Carroll, who was offered temporary employment by Alliant and turned it down. Furthermore, as noted *supra*, n. 2, denial of summary judgment on the issue of Athey's HAC status requires a denial of summary judgment on the issue of his eligibility under the executive RIF plan as well.